### 43566. HICKS v. THE STATE.
(352 SE2d 762)

SMITH, Justice.

Appellant, Robert Karl Hicks, was convicted by a Spalding County jury of malice murder and sentenced to death. We affirm.[1]

*Facts*

Early in the evening of July 13, 1985, the victim, Toni Rivers, drove to an area on Rawls Road to meet a friend with whom she planned to visit Callaway Gardens. When the friend arrived, the victim's automobile was there, but the victim was not.

At about 8:00 p.m. that evening, a resident of Blanton Mill Road heard a loud scream from a nearby pasture area, and then a woman's voice saying, "Don't do that." He saw a car parked near the end of his driveway and walked to it. From there, he looked over a fence, through a gap in the woods, and into the pasture, where he saw someone lying on the ground and saw someone else "jump from the other side [and then] hunker down."

He flagged down two men driving by in a pickup and told them to call the police, that something was going on in the pasture. The two men, Robbie McCune and Charles Garner, heard screams themselves, and, looking toward the pasture, saw a shirtless man with blond hair and a black beard bending over and making stabbing motions. Garner testified that as the man straightened up, he wiped something off and put it into his pocket.

---

[1] The case was tried January 13 through January 17, 1986, the jury returning its verdict as to sentence on January 17. The case was docketed in this court on March 27, 1986, but was stricken from the docket on April 7, 1986, when it was learned that a motion for new trial was pending. The motion for new trial was heard on May 16 and denied May 20, 1986, and the case was redocketed in this court on June 2, 1986. The case was orally argued September 9, 1986.

Garner and McCune got the license number of the car parked by the side of the road and drove away to find a telephone. As they did, they saw the blond male exit the woods, get into his car, drive a few yards up the road, and stop. (The car had run out of gas.)

Garner and McCune found a telephone at the first house down the road, called the sheriff, and returned just in time to see the blond male climb into the back of a black pickup that had stopped to give him a ride. A deputy sheriff approached the area and McCune flagged him down. He told the deputy that the man he had called about was in the back of the other pickup. Meanwhile, Garner got out and ran to the pasture to find the woman.

Sheriff's deputy Chuck Hudson testified that Garner and McCune "flagged me down and told me that the guy sitting in the back of the [pickup] I had just passed was the one they had seen . . . in the wooded area where . . . all the screaming and all had taken place . . . [W]hen they told me that, I turned around and went back and stopped the black pickup truck." Hudson was informed by the driver, whom he knew, that the man in the back had asked for a ride to a gas station.

Hudson asked the man, whom he later identified as the defendant, if he knew anything about a girl or if he had heard anything in the area. The defendant answered negatively. Hudson offered to help the defendant with his car problems, and told him that if "everything was all right, I'd help him get some gas and get his car going." Then, Hudson testified, "Mr. Hicks came down off the truck and started to get in the back of my patrol car, and I made him stop, and I searched him." Hudson found a "folding pocket knife" in the defendant's right front pocket, that was covered in a "dark red substance that appeared to be blood — fresh blood."

Meanwhile, Garner had found the victim, nude from the waist down and covered with blood. She told him she was dying. When Hudson and another deputy arrived at the scene, she begged for help, saying she could not breathe. She clawed at the ground making choking noises until just before the EMT's arrived, when she stopped moving. She soon died.

The victim had "five large, gaping lacerations of the throat . . ., an open gash on the abdomen . . . and eight stab wounds." She died from a near-total loss of blood.

Inside the defendant's automobile, deputy Hudson discovered a pair of women's shorts, a bloody pair of men's socks, a pair of sandals, and a key ring with the initials "T. R."

Blood on the seat of the car, and on the defendant's pants, socks and knife, was identified as being consistent with that of the victim.

*Enumerations of Error*

1. In enumerations one through four and 24, Hicks argues that the evidence does not support the conviction and that his motion for directed verdict and his motion for new trial on this ground should have been granted. We disagree, and find the evidence sufficient under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979) and *Brown v. State*, 250 Ga. 66 (2) (295 SE2d 727) (1982).

2. In his 5th enumeration, Hicks argues that his motion to suppress should have been granted on the ground that the arrest and the searches and seizures were unsupported by probable cause. We find no error.

Deputy Hudson was fully authorized by the circumstances to conduct a pat-down search of the defendant for weapons. *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968). See *Devier v. State*, 253 Ga. 604 (7a) (323 SE2d 150) (1984), and cits.

Aside from the knife discovered on the defendant's person, the only items seized came from the defendant's car. After finding the victim in the area from where Garner and McCune had heard the screams and had seen the defendant making stabbing motions before emerging from the woods, and after discovering on the person of the defendant a bloody knife, deputy Hudson looked into the defendant's car and observed items of women's clothing. The subsequent entry into the automobile was supported by probable cause. See *Speight v. State*, 159 Ga. App. 5 (2) (282 SE2d 651) (1981).[2]

3. In his 6th enumeration, the defendant argues that the court erred by denying the defendant (1) an independent analysis of the blood samples, (2) funds to obtain expert assistance for his challenge to the jury pools, and (3) funds to obtain expert assistance on his motion for change of venue.

As to the blood samples, the trial court offered the defendant an opportunity to have the state crime lab personnel perform any desired additional tests, and specifically left open the possibility of hiring a forensic expert if the defendant could show a necessity therefor. We find no abuse of discretion here, or in the denials of funds on the other matters. See *Spivey v. State*, 253 Ga. 187 (9) (319 SE2d 420) (1984).

4. The trial court did not err by denying the defendant's motion for a daily transcript. *Chenault v. State*, 234 Ga. 216 (3) (215 SE2d 223) (1975).

5. In his 8th enumeration, Hicks states that he "made a motion

---

[2] We note, in addition, that, since the defendant's car was parked with its driver's side tires on the roadway, it was a traffic hazard, and its seizure would have been appropriate in any event. See *South Dakota v. Opperman*, __ U.S. __ (96 SC 3092, 49 LE2d 1000) (1976).

for incidental expenses, including the cost of a haircut and funds for some civilian clothing to wear at trial," and that the trial court denied the motion. He argues that this denial violated his rights "pursuant to the Constitution and laws of the State of Georgia and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States."

At the hearing on the motion, the defense attorney stated that the defendant's mother could cut his hair if the sheriff would let her, but the defendant had no suitable courtroom attire. The district attorney suggested, "Your Honor, if [the defense attorney will] come by my church sometime, I think we can probably find something in the clothing closet." When the defense attorney responded, "That's a deal," the trial judge overruled the motion. The issue was never again raised.

It does not appear from the record that the defendant was denied suitable clothing or that he was unable to get his hair cut. Therefore, whatever the parameters of a defendant's right to a suitable courtroom appearance, the defendant has failed to show a violation of that right. Compare *State v. Pike*, 253 Ga. 304 (320 SE2d 355) (1984).

6. In view of the minimal pre-trial publicity and the small number of prospective jurors excused for cause, the trial court did not err by denying the defendant's motion for a change of venue. See, e.g., *Cargill v. State*, 255 Ga. 616 (10) (340 SE2d 891) (1986); *Spivey v. State*, 253 Ga., supra.

7. Nor did the trial court err by overruling the defendant's jury challenges. Blacks, whites, men and women were all well represented on both the grand and traverse jury lists.[3] Hicks' assertion that "Age . . . has become a recognizable class for purposes of jury pool selection" is incorrect if he means to say that groups defined by age are now cognizable as a matter of law. On the contrary, the case he cites for this proposition states that it is a "question of *fact* . . . [which] depends upon the time and location of the trial." (Emphasis supplied.) *Willis v. Zant*, 720 F2d 1212, 1216 (11th Cir. 1983). Hicks has failed to establish the cognizability of any age (or socioeconomic) group, and has failed to show that any such group was significantly underrepresented on the Spalding County jury lists. See *Parks v. State*, 254 Ga. 403 (6a) (330 SE2d 686) (1985).

8. Contrary to the defendant's 11th enumeration, the trial court did not err by refusing to require the state to elect between proceeding on a malice murder theory or on a felony murder theory. *Dunn v. State*, 251 Ga. 731 (5) (309 SE2d 370) (1983).

---

[3] The absolute disparity for each of these groups was less than 1%. See *Cook v. State*, 255 Ga. 565 (11) (340 SE2d 891) (1986); Rule II (A) (6) of the Unified Appeal Procedure, as amended, 252 Ga. A-13 et seq.

9. Just before the voir dire began, the defendant objected (outside the presence of the jury) to his being shackled during the trial. The trial court responded that the defendant had previously escaped from custody while awaiting the trial of this case and had on several occasions stated to various persons "that he intended to avoid trial, that he was going to escape, [and] that he would knock down a deputy and run from the court." The court stated that for the protection of courtroom personnel and, as well, the defendant himself, it was necessary to shackle the defendant in order to prevent an escape attempt. The court added that, "in order to prevent jurors and prospective jurors from observing the chains and shackles which have been placed about the ankles of the accused, . . . the court has directed and allowed [both] counsel table[s] to be shrouded with cloth [extending] . . . to the floor." The court also ordered that no more than 12 prospective jurors be brought into the courtroom at a time, and that they be brought into the box through the courtroom entrance adjacent to the box, and only after the defendant was properly seated in the courtroom.

Later, prospective jurors were asked if they had read anything in the previous evening's newspaper about the trial. One juror who answered in the affirmative was questioned outside the hearing of the other jurors, and he revealed that he had learned from the newspaper that the defendant's legs were shackled. He stated that he had discussed his knowledge with no other juror. He was excused.

In this case, conditions justified the trial court's decision to shackle the defendant. *Thomas v. State*, 171 Ga. App. 306 (4) (319 SE2d 511) (1984). Moreover, it appears from the record that the court excused the only prospective juror who ever knew that the defendant was shackled. We do not find that the defendant was denied a fair trial.

10. We find no merit to enumerations 13 and 14, attacking the constitutionality of Georgia death penalty laws, and the practice of death-qualifying juries. See, e.g., *Pope v. State*, 256 Ga. 191 (7a) (345 SE2d 600) (1986).

11. Nor do we find any abuse of discretion in the denial of sequestered voir dire. *Curry v. State*, 255 Ga. 215 (2a) (336 SE2d 762) (1985). We note that here, as in *Curry*, "the court reserved the right to sequester on a selective basis if the need arose . . ." Id. fn. 2.

12. In his 16th enumeration, the defendant contends that the trial court should have granted his motion for mistrial after it learned that witnesses in the witness room had been discussing testimony with each other, in violation of the rule of sequestration. OCGA § 24-9-61. See *Travelers Ins. Co. v. Sheppard*, 85 Ga. 751 (36) (112 SE 18) (1890).

Of course, it has long been the rule that a witness who violates

the rule of sequestration is not rendered incompetent. See, e.g., *Rooks v. State*, 65 Ga. 330 (1) (1880); *Edwards v. State*, 55 Ga. App. 187 (1) (189 SE 678) (1937). This long-standing principle was re-affirmed in *Jordan v. State*, 247 Ga. 328 (10) (276 SE2d 224) (1981), in which recent cases departing from the early rule were overruled.

There are, however, cases suggesting that particularly egregious and deliberate violations of the rule might necessitate a mistrial. See, e.g., *Watts v. State*, 239 Ga. 725 (238 SE2d 894) (1977); *Rozier v. State*, 124 Ga. App. 481 (2) (184 SE2d 203) (1971). To what extent these cases are affected by the more recent *Jordan* case, we need not decide, for it is clear that the trial court in this case did not err by denying the defendant's motion for mistrial.

The trial court conducted a hearing outside the presence of the jury to determine what had occurred.

A defense witness testified that she overheard a conversation in the state's witness room wherein Charles Garner, upon his return from testifying, "was talking about somebody a running and somebody else sitting in the car, and one of the deputies that was sitting there said that he was also running . . . and then . . . one of the other guy[s] [said that the defendant's] appearance wasn't the same, but the nose and eyes were the same, but he didn't look nothing like he did that night."[4]

It was shown that the only witness in the room who had not yet testified when these conversations allegedly occurred was deputy Hudson. Hudson testified that he overheard some comments that the defendant looked different than he had the night of the murder, but he heard no comments about anyone running. Deputy Hudson, of course, did not himself observe the crime being committed, but merely took the defendant into custody.

In these circumstances, we find no error in the refusal to declare a mistrial. *Bridges v. State*, 242 Ga. 251 (7) (248 SE2d 647) (1978); *Little v. State*, 142 Ga. App. 343 (2) (235 SE2d 764) (1977); *Finley v. State*, 101 Ga. App. 61 (2) (113 SE2d 144) (1960).

13. Next, the defendant complains of the introduction of photographs of the victim. However, we find no violation of the rule set forth in *Brown v. State*, 250 Ga. 862 (5) (302 SE2d 347) (1983), and the photographs were not irrelevant, inasmuch as they showed the various injuries inflicted upon the victim. We agree with the defendant's suggestion that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of

---

[4] Garner had testified before the jury that in contrast to the defendant's present appearance, on the night of the murder he "had longer hair and a beard, but that's . . . him."

undue delay, waste of time, or needless presentation of cumulative evidence." However, such considerations are appropriately committed to the trial court's sound exercise of discretion, and we find no abuse of discretion here.

Hicks also complains of the admission in evidence of a photograph taken on the night of his arrest, which shows him from the chest up, with his back to the camera, his hands on the wall in front of him, and his face turned back toward the camera. The defendant contends that this photograph is unnecessarily prejudicial because it shows him "in prison clothes, and in a spread-eagle position." However, there is nothing remarkable or obviously prison-issue about the dark-blue short-sleeved shirt worn by the defendant, and it was explained to the jury that the defendant had merely been positioned so that his bruised right hand and his face could both be seen in the photograph, to better identify the hand as his. We find no error.

14. In his 18th enumeration, Hicks contends that the trial court erred by refusing to exclude testimony by a state psychologist, and by overruling the defendant's Fifth Amendment objections.

"In *Estelle v. Smith*, 451 U. S. 454 (101 SC 1866, 68 LE2d 359) (1981), the United States Supreme Court found that admission of a psychiatrist's testimony on the issue of a defendant's future dangerousness at the penalty phase of a capital case when the testimony was the result of an in-custody court-ordered competency examination infringed the defendant's Fifth Amendment constitutional guarantee against self-incrimination." *Harris v. State*, 256 Ga. 350, 352 (349 SE2d 374) (1986). The predecessor to the Eleventh Circuit Court of Appeals has "viewed *Smith* as standing for the proposition that when a psychiatric or psychological examination is 'used to determine a defendant's culpability or responsibility for the crimes charged against him, the Fifth Amendment privilege is involved because the use of (the) examination in this context may assist the State in establishing the basis for imposition of criminal punishment.' [Cit.]" *Spivey v. Zant*, 661 F2d 464, 475 (fn. 17) (5th Cir. Unit B) (1982).

Without determining whether Hicks had waived his Fifth Amendment rights in the manner set forth in *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), the trial court, relying upon *Wilson v. Bonner*, 166 Ga. App. 9, 16 (303 SE2d 134) (1983), denied the defendant's motion to exclude on the ground that, since the court had appointed the psychologist to examine the defendant, the psychologist was a witness for the court, and not the prosecution, and the privilege contained in OCGA § 24-9-21 did not apply.

However, *Wilson v. Bonner* and OCGA § 24-9-21 concern *statutorily* privileged communications, including that between a psychiatrist and a patient. (See also OCGA § 43-39-16, concerning the confidentiality of communications between a psychologist and a client.) To

say that the psychiatrist-patient privilege does not apply when the psychiatrist is appointed by the court to examine the defendant simply does not answer the question of whether the defendant's *constitutional self-incrimination* privilege applies.

However, if "the psychiatrist's findings [are] confined to a determination of the [defendant's] competency [to stand trial,] . . . no Fifth Amendment issue would arise . . ." *Harris v. State*, supra. "Similarly, a defendant who enters a plea of not guilty by reason of insanity may be required to submit to a sanity examination by the State's psychiatrist." Ibid. See also *Ingram v. State*, 253 Ga. 622 (14) (323 SE2d 801) (1984) (noting that the defense introduction of psychiatric testimony constitutes a waiver of the defendant's Fifth Amendment privilege).

In this case, pursuant to Rule 31.4 of the Georgia Uniform Superior Court Rules, the defendant filed a notice of intent to raise the issue of insanity. He requested, and eventually received, funds with which he retained the services of a private psychiatrist who testified on his behalf at trial. The state's psychologist did not testify until *after* the defense psychiatrist testified. In these circumstances, whether or not the defendant was advised of his *Miranda* rights by the state's psychologist, we find no Fifth Amendment error.[5]

15. In his 19th enumeration of error, the defendant complains of three instances of the state's examination of its witnesses.

(a) Robert McCune testified that, after he and Charles Garner were flagged down and asked to call the police because something was going on in the pasture, they backed up and listened. Then, McCune testified, "Mr. Garner said, I heard a woman scream. I said are you sure. He said yes. And I kept looking over — it was on the right hand side. I kept looking, and then I said — I heard a woman scream. I said, Charles, I said, I heard it, too! . . . So I pulled up a little further . . . [and] a little bit further . . . I looked over in the woods, and at that point, I seen a guy standing there . . . He had blond hair and had a heavy black beard . . ."

Hicks interposed a hearsay objection to McCune's testimony that Garner said he heard a scream. He contends that the trial court erred

---

[5] We do not find it significant in a Fifth Amendment context that the examination by the state psychologist occurred prior to the filing of defendant's notice of intent to rely on a defense of insanity, for, in any event, the state psychologist did not testify until *after* the defendant had filed his notice and *after* his psychiatrist had testified on his behalf. Although the defendant makes no Sixth Amendment claim here, we note that the record shows that his attorney was aware of the court's intention to have the defendant evaluated, and helped the state draft the court's order. Thus the defendant is in no position to claim that he was denied the assistance of counsel "in making the significant decision of whether to submit to the examination and to what end the . . . findings could be employed." *Estelle v. Smith*, supra, 451 U. S. at 471 (101 SC at 1877).

by overruling the objection. We do not agree.

Generally speaking, it is desirable "to permit each witness to tell his story in a natural way by telling all that happened at the time of the narrated incident, including those details which give life and color to the story." Cleary, McCormick on Evidence (2nd ed. 1972), § 288, p. 686. More specifically, "all courts today recognize an exception to the hearsay rule for certain statements made under the influence of a startling event." Id. § 297, p. 704. Here, Garner's statement was a spontaneous reaction to an exciting event and was admissible as an exception to the hearsay rule. See OCGA § 24-3-3. We note, in addition, that the remark also serves to explain McCune's subsequent conduct. See OCGA § 24-3-2; *Mincey v. State*, 251 Ga. 255 (12) (304 SE2d 882) (1983). We find no error.

(b) McCune next testified that after he and Garner saw the man, he said, "[S]omething's going on Charles . . . [I]t's just not right. At that time, the man bent over and — well, it was kind of a motion — it's hard to explain . . . [He] made a motion like this — (demonstrating). I said [to Charles,] something is bad wrong. I said, it looked like the man cut her throat."

The defendant objected to the testimony that "it looked like the man cut her throat," on the ground that it was a conclusion which invaded the province of the jury on a factual issue. He contends the trial court erred by overruling this objection. We do not agree.

"The true line of demarcation [between a conclusion and a 'shorthand rendition of fact'] is where an inference, necessarily involving certain facts, may be stated without the facts, the inference being the equivalent of a specification of the facts." *Pollard v. Rogers*, 173 S 881, 885 (Ala. 1937). "[T]he admission of such evidence is not open to the common objection to nontechnical opinion evidence, that the function of the jury is being usurped." Ibid. See also *Travelers Ins. Co. v. Sheppard*, supra, 85 Ga. 751 (8).

Here, the witness was simply describing, as concretely as he could, what he observed. Thus, his testimony does not fall within the opinion rule, and *Williams v. State*, 254 Ga. 508 (330 SE2d 353) (1985), and *Fordham v. State*, 254 Ga. 59 (325 SE2d 755) (1985), are inapplicable.

(c) The defendant's psychiatrist testified that she had consulted and relied upon the Diagnostic and Statistical Manual of Mental Disorders in making her diagnosis of the defendant, and that he suffered from "intermittent explosive disorder," which she described as a "major psychiatric illness."

The state's psychologist testified that the defendant had a "mixed character disorder" falling short of mental illness. He was cross-examined extensively from the Diagnostic and Statistical Manual of Mental Disorders as to why he had ruled out a diagnosis of

intermittent explosive disorder.

He testified, among other things, that he taught from the manual, and that "only people with a very narrow and limited understanding of psychiatry consider that to be the bible. In other words, there's no way that you can put into that book all the things that figure into a diagnosis." On re-direct, the state asked him about the manner in which the manual was compiled by the American Psychiatry Association, and the answer, basically, was that "all of big-shot psychiatrists in the country . . . got together, and they would take one diagnosis at a time and decide by consensus what criteria they were going to look for." The state then asked the psychologist about the manual's changing views of homosexuality. The defendant's objection to the question was overruled.

We find no error. The question was not, as the defendant contends, irrelevant. Although the manual is surely a valuable and useful psychological reference, it is neither mechanistically precise nor immutable, and the jury was entitled to know that.

16. Early in December 1985, the trial court ordered that the forensic services section of Central State Hospital in Milledgeville provide a psychologist to assist the defendant in compliance with *Ake v. Oklahoma*, 470 U. S. ___ (105 SC 1087, 84 LE2d 53) (1985). However, at a hearing on December 30, 1985, the court announced that the Central State psychologist who had originally agreed to assist the defendant had asked for permission to withdraw, citing an "awkward" position resulting from an associate of his having already rendered an opinion in the case for the court. The court announced that it would now authorize the expenditure of funds for a psychiatrist of the defendant's own choosing.

The defendant located a suitable psychiatrist, Dr. Andrea C. Bradford, who was retained on January 9, 1986. Dr. Bradford discussed the case with the defense attorneys and reviewed background material that day, and interviewed the defendant on the 10th. On the 11th, she interviewed some of the defendant's relatives, consulted psychiatric literature, and again talked to the defense attorneys, at which time she informed them that she had reached a "differential diagnosis," and that a "conclusive diagnosis" would require a neurological evaluation, including an electroencephalogram, as well as further review of literature and additional interviews with the defendant and close family members.

The defense attorneys contacted the court on the 12th, and orally requested a continuance and additional funds for a neurological examination. The requests were denied. The next day, the case was called to trial, and the defendant renewed his motion in writing, accompanied by an affidavit from the psychiatrist, dated January 11, 1986, reciting the foregoing information.

After considering the contents of the affidavit, the court, noting that the state's psychologist had conducted a neurological screening exam and had found no evidence of neurological disease, denied the motion. Dr. Bradford testified at trial that her diagnosis of intermittent explosive disorder was now "firm," noting that "[i]nitially it was provisional and dependent upon . . . ruling out [an] anti-social personality disorder." A person suffering from intermittent explosive disorder, she said, would experience "episodic loss of control of impulses; that is, the impulse becomes irresistible, [and] despite the fact that the person may realize what it is they are doing, they are unable to not do it." She testified that a high percentage of persons manifesting this disorder "have organic pathology in their brains" including, on "rare occasions," a brain tumor, and, on "some occasions, epilepsy." The patient might exhibit "very subtle abnormalities" that would not show up during a screening neurological examination, but only after a full neurological examination by a competent neurologist, which she was not.

Dr. Bradford testified, however, that the defendant understood the difference between right and wrong, and was not suffering from any delusions, whether or not his disorder was the product of neurological disease.

At the close of her examination, the court asked a few questions of its own, as follows:

"The Court: Let me have my time now. I need to ask her something.

"Ms. Jacobs [for the defense]: Oh, certainly, Your Honor.

"The Court: I'll be very brief. I'm sure you understand that under Georgia law, the defense of insanity is two-pronged. One, if the person is unable to distinguish between right and wrong. In this state, he's termed mental — he's termed to be insane.

"The Witness: Yes.

"The Court: A second branch of insanity is if a person is acting under a delusional compulsion. In order for that to exist, there would have to be evidence that the defendant was laboring under a delusion first, secondly, that the act itself was connected with the delusion, and furthermore, that the delusion would, if true, justify the act. Now, as I understand it, your testimony is that he was not insane by reason of not knowing the difference between right and wrong, and that he's not insane by reason of having labored under a delusional compulsion at the time of the act.

"The Witness: That's correct.

"The Court: But your testimony is that he was mentally ill, as that term is defined in Georgia law, by reason of suffering from an intermittent explosive disorder.

"The Witness: (Nods head.)

"The Court: And there's no contention, as far as you're concerned, that he didn't know the difference between right and wrong at the time of the act, if there was an act?

"The Witness: That's correct.

"The Court: All right. I just wanted to be sure I understood."

(a) In his 20th enumeration, the defendant contends that the trial court erred by denying his motion for a continuance and by denying funds for neurological testimony. We disagree. The defense psychiatrist was able to make a firm diagnosis that the defendant had an intermittent explosive disorder. The only question in her mind was whether the disorder was in whole or part the product of a subtle neurological impairment not affecting the defendant's ability to differentiate between right and wrong. A neurological examination could only have served to assign neurological disease, as opposed to psychological factors, as the cause of the defendant's disorder.

The record shows that the defendant was given adequate time to develop a defense. The court did not abuse its discretion by denying the motion for continuance. *Ealy v. State*, 251 Ga. 426 (3) (306 SE2d 275) (1983).

(b) In his 21st enumeration, the defendant complains of the questions posed by the court to Dr. Bradford. He argues that the court's questioning was inappropriate in light of the provisional diagnosis, and that the questions improperly sought a legal conclusion on an issue of ultimate fact. Inasmuch as the defendant interposed no objection to the court's questioning, we find no error.

(c) In his 22nd enumeration, the defendant argues that Georgia law on insanity is constitutionally inadequate. He argues that in addition to the right-wrong test of OCGA § 16-3-2 and the delusional-compulsion test of OCGA § 16-3-3, the law ought to provide for an impulse-control-disorder insanity defense, as the federal law does.

We note, however, that the Insanity Defense Reform Act of 1984, Pub. L. No. 98-473, § 402, 98 Stat. 1837, 2057 (codified at 18 USCA § 20 (Supp. 1986); Fed. R. Evid. 704 (b)), has produced a number of changes to the insanity defense in federal courts, including the elimination of the volitional prong of the defense.

"[Thus] under the new statute, a defendant who is unable to conform his actions to the requirements of law may be convicted of a crime. Such a conviction, however, does not constitute cruel and unusual punishment. A primary reason that the definition of insanity was altered by the Insanity Reform Act is that psychiatrists themselves are unable to agree upon the meaning of 'an irresistible impulse.' *See* S. Rep. 225, 98th Cong., 2d. Sess. 226-29, *reprinted in* 1984 U. S. Code Cong. & Ad.News 3182, 3408-11. In light of the uncertain nature of psychiatric theory in this area, . . . [Congress decided] that society must be protected from individuals who may be

unable to conform their conduct to the law. When psychiatrists are unable to diagnose, much less treat, such individuals, it is not cruel and unusual punishment for Congress to restrict the defense of insanity to those persons who are capable of proving that they did not understand the nature and quality of the act committed." *United States v. Freeman*, 804 F2d 1574, 1576-77 (11th Cir. 1986).

Georgia insanity laws are not constitutionally inadequate.

17. The state's questioning of Dr. Bradford about the defendant's "explosions," and of the autopsist concerning the probability of permanent scarring had the victim lived, were not impermissibly speculative or irrelevant. Enumeration 23 is without merit.

18. The trial court did not err by failing to give the defendant's requested charges verbatim. See *Putman v. State*, 251 Ga. 605 (7) (308 SE2d 145) (1983). Nor did the court err by instructing the jury that it could not find the defendant guilty of malice murder *and* felony murder, but would have to decide whether he was guilty of either. The court's charge on malice murder was not burden shifting. See *Welch v. State*, 254 Ga. 603 (5) (331 SE2d 573) (1985). The court did not err by recharging the jury only on the points requested. *Williams v. State*, 249 Ga. 6 (6) (287 SE2d 31) (1982). We agree that the trial court's charge on insanity placed the burden of proof as to that issue on the defendant. However, contrary to the defendant's argument, the court did not err by doing so. *United States v. Freeman*, supra; *Brown v. State*, 250 Ga. 66 (2) (295 SE2d 727) (1982). The court's charge that the jury was "not responsible for the consequences" of its verdict, but only its "truthfulness" was not error. The court did not err by refusing to give the defendant's request to charge voluntary manslaughter. *Bowen v. State*, 241 Ga. 492 (246 SE2d 322) (1978). Enumeration 25 is without merit.

19. In his 26th enumeration, the defendant contends that the state was allowed to present irrelevant evidence in aggravation. We find no error.

(a) First, evidence is not inadmissible in aggravation simply because it does not pertain to a specific statutory aggravating circumstance. Although the death penalty cannot be imposed unless the jury finds at least one of the statutory aggravating circumstances enumerated in OCGA § 17-10-30 (b) (1-10), "[t]he state is not limited to proof only of the enumerated statutory aggravating circumstances. [Cits.]" *Devier v. State*, 253 Ga., supra at 618.

(b) Second, the defendant's previous rape conviction was admissible to establish the § b (1) statutory aggravating circumstance, since, in this context, rape is a capital felony. See *Crawford v. State*, 254 Ga. 435 (5) (330 SE2d 567) (1985); *Waters v. State*, 248 Ga. 355 (13) (283 SE2d 238) (1981).

(c) Third, "a defendant's character in general, and his conduct

while in prison, are relevant to the question of sentence. [Cits.]" *Fugitt v. State*, 256 Ga. 292, 296 (348 SE2d 451) (1986). Thus, evidence of the defendant's escape was properly admitted in aggravation.

20. In his 27th enumeration, the defendant complains that mitigation evidence was improperly limited in two instances.

In the first instance, the state objected to the form of a defense question asking the witness to "tell [the jurors] whatever you want to tell them." In response to the objection, the defense attorney volunteered "to make the question a little bit tighter," and the court stated: "All right. Understand, I'm not trying to limit you in any way as to anything you want to bring out."

In the second instance, the defendant sought to elicit from his psychiatrist (who testified at the sentencing phase of the trial as well as at the guilt phase) how she felt "about the death penalty in general." The state's objection to this question was sustained. However, she was allowed to testify that, in her professional opinion, the defendant had no control over his outbursts, and that his life should be spared.

We find no improper limitation of the defendant's case in mitigation.

21. The defendant also asked Dr. Bradford about the insanity laws of other states with respect to the concept of "irresistible impulse." The question drew an objection, which, in effect, was overruled, and the defendant was allowed to ask the question. Nonetheless, the defendant now complains that the court's comments during the discussion were so prejudicial as to require reversal of the sentence.

The discussion proceeded as follows:

"Mr. Fowler: Your Honor, I'm going to object to her going into any testimony about any Federal law on insanity or any other state's insanity law. It's not relevant, and it's certainly not the law in this State.

"Ms. Jacobs: May I be heard?

"The Court: Yes, ma'am.

"Ms. Jacobs: Your Honor, we're not doing it for purposes of mustering the insanity defense. That's already been denied by this jury. This is a matter in mitigation, and I think the jury has a right to think of what would be mitigating in other places.

"Mr. Fowler: Your Honor, at this point — well, I won't say that. Certainly, what the law in some other state is has nothing to do with the mitigation in this case. The law in some other state wouldn't apply here.

"The Court: I don't see how it does either. What some other jury might feel, what some other person might do, that's not the question, it's what this jury thinks is proper. Of course, the Court acknowledges

the fact that some states recognize irresistible impulse as a form of insanity, but Georgia doesn't. That's not our law, and this jury has got to determine this case by Georgia law, not what it might be in some other state.

"Ms. Jacobs: But, Your Honor, their determination right now is not based on this — the statutes involving what rises to the level of insanity as a legal defense. Their determination right now is what, if anything, could commend mercy to their minds.

"The Court: All right. Go ahead. Ask the question.

"Ms. Jacobs: Thank you, Your Honor."

The defendant argues that the court erroneously implied that evidence falling short of establishing a complete defense to criminal liability was irrelevant to the issue of sentence. He contends, and we agree, that evidence of mental illness not sufficient to sustain an insanity defense under Georgia law might appropriately be offered and considered in mitigation of sentence.

However, we do not read the court's remarks as implying that such evidence may not be considered in mitigation. Under Georgia law, as the court subsequently charged the jury, mitigating circumstances do not necessarily constitute a justification for or a defense to the crime, and, moreover, the jury's authority to recommend mercy is unlimited and not dependent upon a finding of mitigating circumstances. See *Romine v. State*, 251 Ga. 208 (10b) (305 SE2d 93) (1983).

The court's concern was not whether evidence of mental illness falling outside the statutory definition of insanity might be admissible in mitigation, but whether the laws of *another state* might appropriately be introduced in mitigation (particularly, we might add, through the testimony of a witness who is not a legal expert, and who, in fact, misstates the prevailing federal law — see Division 16 (c), supra). We need not decide this issue, however, because the court allowed the testimony. The court's remarks, especially when viewed in light of the court's formal charge on mitigating circumstances, did not improperly restrict the jury's consideration of mitigating circumstances.

22. The court instructed the jury at the sentencing phase "that this portion of [the charge] is a continuation of the charge which I have heretofore given to you, and you will consider it as such. I charge you that this presentencing hearing, which has just been conducted, is for additional evidence and in no way excludes from consideration in this phase of the case, the matters heard on the issue of guilt or innocence. I further charge you that you can consider all the facts and circumstances of the case as presented, both during the guilt or innocence phase of the trial and on this sentencing phase of the trial."

We find no merit to the defendant's contention that the court's characterization of its sentencing charge as a "continuation" of its guilt-innocence charge precluded consideration of his insanity evi-

dence in mitigation. See *Romine v. State*, 256 Ga. 521 (3) (350 SE2d 446) (1986); *Ross v. State*, 254 Ga. 22 (6) (326 SE2d 194) (1985).

23. The defendant next raises a number of complaints relating to the state's closing argument at the sentencing phase of the trial. He objected at trial only to that portion of the state's closing argument discussing the issue of future dangerousness. Citing *Hance v. Zant*, 696 F2d 940 (11th Cir. 1983), the defendant argues that this portion of the argument was prejudicial, inflammatory, and improper.

It is true that *Hance* condemned, inter alia, an argument relating to future dangerousness. However, *Hance* has been overruled. See *Brooks v. Kemp*, 762 F2d 1383, 1399 and 1404-1405 (11th Cir. 1985); *Tucker v. Kemp*, 762 F2d 1480, 1486 (11th Cir. 1985). As we have noted, "[t]he question whether a defendant is someone whose probable future behavior indicates a need for the most effective means of incapacitation, i.e., the death penalty, is not constitutionally irrelevant. [Cits.]" *Ross v. State*, supra at 34. In other words, "the sentencing body may consider the future dangerousness of a particular defendant." *Brooks v. Kemp*, supra at 1406. It follows, then that the state (and the defense) may present argument on the subject.

The defendant now complains of several portions of the argument to which he did not object at trial. As we have pointed out, "[o]bjections to argument ordinarily cannot be raised for the first time after trial." *Spivey v. State*, 253 Ga., supra at 191. It is necessary, however, that we determine whether a death sentence has been imposed as the result of passion, prejudice, or other arbitrary factor OCGA § 17-10-35 (c) (1); *Conner v. State*, 251 Ga. 113, 123 (303 SE2d 266) (1983), and, even if improper arguments have not been timely objected to at trial, reversal is required if " 'there was a reasonable probability that the improper arguments changed the jury's exercise of discretion in choosing between life imprisonment or death.' [Cit.]" *Ford v. State*, 255 Ga. 81, 94 (335 SE2d 567) (1985).

Of course, this standard comes into play only if the state has indeed argued improperly. In this case, we find no improprieties.

The defendant contends that the state argued improperly that emotion and sympathy are irrelevant. We noted in *Ford v. State*, supra, that, although it would be improper to argue that "the jury has no *right* to be merciful," the state may " 'urge vigorously' that mercy is inappropriate 'in the case at hand.' " Id. at 93-94. We find no argument here that emotion and sympathy were legally irrelevant, see *Legare v. State*, 250 Ga. 875 (2) (302 SE2d 351) (1983), and the state was entitled to ask the jury not to be sympathetic to this defendant. Nor do we find anything improper about the state's argument relating to the defendant's credibility. As we pointed out in *Conner v. State*, supra, counsel may, in closing argument, " 'assail the credibility of witnesses, when that is impeached by direct evidence, or by the in-

consistency or incoherence of (their) testimony, (their) manner of testifying, (their) appearance, or by circumstances.' " Id. at 122 (quoting *Mitchum v. State*, 11 Ga. 615, 631 (1852)).

So, too, may counsel " 'allude to such principles of divine law relating to transactions of men as may be appropriate to the case.' " *Conner v. State*, supra (quoting *Western & Atlantic R. Co. v. York*, 128 Ga. 687, 689 (58 SE 183) (1907)).

Finally, it is not improper to argue that the defendant himself — and not the police, the prosecutor, or the jury — is responsible for his punishment. *Brooks v. Kemp*, supra at 1410-11.

24. The defendant argues that the evidence does not support the trial court's charge on rape and kidnapping with bodily injury as capital felonies contemporaneous to the commission of the offense of murder. See OCGA § 17-10-30 (b) (2). Inasmuch as the jury found neither of these aspects of the § b (2) aggravating circumstance, we need not answer this argument.

The defendant also contends that the court erred by failing to give his requests to charge verbatim. However, it is well settled that a trial court is not required to give a defendant's request to charge verbatim so long as the charge given adequately covers the same principles. *Putman v. State*, supra.

We find no merit to the defendant's contentions that the "illogical order" of the charge confused the jury, and that sending to the jury a list of the contended statutory aggravating circumstances along with a verdict form gave impermissible emphasis to them.

### Sentence Review

25. The jury found the following statutory aggravating circumstances: "[O]ne, the offense of murder was committed by a person with a prior record of conviction for a capital felony, to wit: rape; two, the offense was committed while the offender was engaged in the commission of the offense of aggravated battery; three, the offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved an aggravated battery to the victim." See OCGA §§ 17-10-30 (b) (1), (b) (2) and (b) (7). The evidence supports these findings beyond a reasonable doubt. OCGA § 17-10-35 (c) (2). Compare *Davis v. State*, 255 Ga. 588 (3 c) (340 SE2d 862) (1986).

26. We do not find that the sentence of death was imposed in this case under the impermissible influence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1).

27. The sentence of death is not excessive or disproportionate punishment for a vicious and brutal murder committed by a defendant with a prior conviction of a capital felony. OCGA § 17-10-35 (c) (3).

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 13, 1987 —
RECONSIDERATION DENIED MARCH 3, 1987.

Harold A. Sturdivant, Tamara Jacobs, for appellant.
*Johnnie L. Caldwell, District Attorney, J. David Fowler, Assistant District Attorney, Michael J. Bowers, Attorney General, J. Michael Davis, Assistant Attorney General,* for appellee.

APPENDIX.

*Cook v. State,* 255 Ga. 565 (340 SE2d 891) (1986); *Hance v. State,* 254 Ga. 575 (332 SE2d 287) (1985); *Walker v. State,* 254 Ga. 149 (327 SE2d 475) (1985); *Allen v. State,* 253 Ga. 390 (321 SE2d 710) (1984); *Mincey v. State,* 251 Ga. 255 (304 SE2d 882) (1983); *Conner v. State,* 251 Ga. 113 (303 SE2d 266) (1983); *Smith v. State,* 249 Ga. 228 (290 SE2d 43) (1982); *Cunningham v. State,* 248 Ga. 558 (284 SE2d 390) (1981); *Cape v. State,* 246 Ga. 520 (272 SE2d 487) (1980); *Tucker v. State,* 245 Ga. 68 (263 SE2d 109) (1980); *Davis v. State,* 241 Ga. 376 (247 SE2d 45) (1978); *Stephens v. State,* 237 Ga. 259 (227 SE2d 261) (1976); *Spencer v. State,* 236 Ga. 697 (224 SE2d 910) (1976).