[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**JUNE 16, 2003**
**THOMAS K. KAHN**
**CLERK**

No. 01-11621

D. C. Docket No. 97-00051 CV-3-JTC

ROBERT KARL HICKS,

Petitioner-Appellant,

versus

FREDERICK J. HEAD, Warden,
Georgia Diagnostic and Classification Prison,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Georgia

**(June 16, 2003)**

Before EDMONDSON, Chief Judge, BIRCH and DUBINA, Circuit Judges.

DUBINA, Circuit Judge:

Petitioner Robert Karl Hicks ("Hicks"), a death row inmate, appeals the district court's order denying him federal habeas relief pursuant to 28 U.S.C. § 2254. We granted Hicks's motion for a Certificate of Appealability ("COA")[1] on a question of first impression for our circuit: whether violations of *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), are subject to harmless error analysis and, if so, whether the trial court's denial of psychiatric assistance until a few days before trial, in violation of *Ake*, constitutes harmless error. Joining several other circuits, we hold that *Ake* violations are amenable to harmless error analysis, and we conclude that the *Ake* violation in this case was harmless. Accordingly, we affirm the judgment of the district court denying habeas relief.

## I. BACKGROUND

A. *Facts*

The facts are taken verbatim from the Georgia Supreme Court's decision in Hicks's direct appeal:

> Early in the evening of July 13, 1985, the victim, Toni Rivers, drove to an area on Rawls Road to meet a friend with whom she planned to visit Callaway Gardens. When the friend arrived, the victim's automobile was there, but the victim was not.

---

[1] *See* 28 U.S.C. § 2253.

At about 8:00 pm that evening, a resident of Blanton Mill Road heard a loud scream from a nearby pasture area, and then a woman's voice saying, "Don't do that." He saw a car parked near the end of his driveway and walked to it. From there, he looked over a fence, through a gap in the woods, and into the pasture, where he saw someone lying on the ground and saw someone else "jump from the other side [and then] hunker down."

He flagged down two men driving by in a pickup and told them to call the police, that something was going on in the pasture. The two men, Robbie McCune and Charles Garner, heard screams themselves, and, looking toward the pasture, saw a shirtless man with blond hair and a black beard bending over and making stabbing motions. Garner testified that as the man straightened up, he wiped something off and put it into his pocket.

Garner and McCune got the license number of the car parked by the side of the road and drove away to find a telephone. As they did, they saw the blond male exit the woods, get into his car, drive a few yards up the road, and stop. (The car had run out of gas.)

Garner and McCune found a telephone at the first house down the road, called the sheriff, and returned just in time to see the blond male climb into the back of a black pickup that had stopped to give him a ride. A deputy sheriff approached the area and McCune flagged him down. He told the deputy that the man he had called about was in the back of the other pickup. Meanwhile, Garner got out and ran to the pasture to find the woman.

Sheriff's deputy Chuck Hudson testified that Garner and McCune "flagged me down and told me that the guy sitting in the back of the [pickup] I had just passed was the one they had seen . . . in the wooded area where . . . all the screaming and all had taken place . . . [W]hen they told me that, I turned around and went back and stopped the black pickup truck." Hudson was informed by the driver, whom he knew, that the man in the back had asked for a ride to a gas station.

3

Hudson asked the man, whom he later identified as the defendant, if he knew anything about a girl or if he had heard anything in the area. The defendant answered negatively. Hudson offered to help the defendant with his car problems, and told him that if "everything was all right, I'd help him get some gas and get his car going." Then, Hudson testified, "Mr. Hicks came down off the truck and started to get in the back of my patrol car, and I made him stop, and I searched him." Hudson found a "folding pocket knife" in the defendant's right front pocket, that was covered in a "dark red substance that appeared to be blood – fresh blood."

Meanwhile, Garner had found the victim, nude from the waist down and covered with blood. She told him she was dying. When Hudson and another deputy arrived at the scene, she begged for help, saying she could not breathe. She clawed at the ground making choking noises until just before the EMT's arrived, when she stopped moving. She soon died.

The victim had "five large, gaping lacerations of the throat . . ., an open gash on the abdomen . . . and eight stab wounds." She died from a near-total loss of blood.

Inside the defendant's automobile, deputy Hudson discovered a pair of women's shorts, a bloody pair of men's socks, a pair of sandals, and a key ring with the initials "T.R."

Blood on the seat of the car, and on the defendant's pants, socks and knife, was identified as being consistent with that of the victim.

*Hicks v. State*, 352 S.E.2d 762, 767-68 (Ga. 1987) (alterations in original).

B. *Procedural History*

On June 13, 1985, a jury in Spalding County, Georgia, found Hicks guilty of the malice murder of Toni Rivers and recommended that the court impose a death

4

sentence. The jury found three statutory aggravating circumstances: the offense of murder was committed by a person with a prior record of conviction for a capital felony, rape; the offense was committed while the offender was engaged in the commission of the offense of aggravated battery; and the offense of murder was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim. *See* Ga. Code Ann. § 17-10-30(b)(1), (b)(2) and (b)(7) (1997). The Supreme Court of Georgia affirmed Hicks's conviction and sentence. *Hicks*, 352 S.E.2d at 779. The United States Supreme Court denied *certiorari* on June 15, 1987. *Hicks v. State*, 482 U.S. 931, 107 S. Ct. 3220, 96 L. Ed. 2d 706 (1987).

Hicks filed his first state habeas petition in the Superior Court of Butts County, Georgia. Following an evidentiary hearing, the state court denied relief. The Supreme Court of Georgia denied Hicks's application for a certificate of probable cause to appeal, and the United States Supreme Court denied *certiorari*. *Hicks v. Kemp*, 494 U.S. 1074, 110 S. Ct. 1797, 108 L. Ed. 2d 798 (1990). Hicks then filed a federal habeas petition, and the State moved to dismiss the petition for lack of exhaustion. The district court entered judgment dismissing the petition without prejudice. Hicks filed a second state habeas petition, and the State moved to dismiss the petition as successive under state procedural rules. After

5

conducting a hearing on the motion to dismiss, the state court dismissed the petition. The Georgia Supreme Court denied Hicks's application for probable cause to appeal, and the United States Supreme Court denied *certiorari* review.

Hicks filed his second federal habeas petition on April 24, 1997, and filed an amended petition on June 8, 1998. The district court denied him any relief on the claims he raised. The district court specifically found that Hicks's *Ake* claim was subject to harmless error analysis and that under the *Brecht v. Abrahamson* harmless error standard, the constitutional violation did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. 619, 637-38, 113 S. Ct. 1710, 1722, 123 L. Ed. 2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 2d 1557 (1946)). The district court denied Hicks's motion to alter or amend the judgment, stating that Hicks had failed to make a substantial showing of the denial of a constitutional right. In a separate order, the district court specifically denied Hicks's application for a COA. Hicks filed a notice of appeal and application for a COA in this court. We granted the COA on the sole issue of whether *Ake* violations are subject to harmless error analysis and, if so, whether the trial court's denial of a mental health expert until shortly before trial constitutes harmless error.

## II. STANDARD OF REVIEW

We give deference to state courts' merits-adjudication of constitutional questions unless the decisions are "contrary to" or an "unreasonable application of . . . clearly established" United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000). *See also* 28 U.S.C. § 2254(d).

## III. DISCUSSION

A. *Whether Ake violations are subject to harmless error analysis.*

We will assume, without deciding, that the state court's determination of no *Ake* error was an unreasonable application of clearly established Supreme Court precedent.[2] In *Ake*, the Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." 470 U.S. at

---

[2] The state court concluded that the appointment of Dr. Andrea Bradford ("Dr. Bradford") just days before the trial satisfied *Ake*. Specifically, the Georgia Supreme Court concluded that the trial court did not err in denying Hicks's motion for a continuance and request for additional funds for neurological testing. The Georgia Supreme Court's determination that the denial of Hicks's motion for a continuance did not violate *Ake* was considered by the district court to be an unreasonable application of the clearly established Supreme Court precedent.

74, 105 S. Ct. at 1091-92.  The constitutional right recognized in *Ake* provides a criminal defendant the assistance of a psychiatrist in two general circumstances: "when [the] defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, . . . . [and] when the State presents psychiatric evidence of the defendant's future dangerousness" during a capital sentencing hearing.  *Ake*, 470 U.S. at 83, 105 S. Ct. at 1096.

To date, we have not addressed the question whether *Ake* error is amenable to harmless error analysis.  The question whether a particular constitutional error is subject to harmless error analysis depends upon whether the error is properly characterized as trial error or structural error.  Trial error is error that "occur[s] during the presentation of the case to the jury." *Arizona v. Fulminante*, 499 U.S. 279, 307-08, 111 S. Ct. 1246, 1264, 113 L. Ed. 2d 302 (1991).  Such error "is amenable to harmless-error analysis because it may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." *Brecht*, 507 U.S. at 629, 113 S. Ct. at 1717 (alterations in original) (internal quotations omitted).  In contrast, structural error is error "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona*, 499 U.S. at 310, 111 S. Ct. at 1265.  By its very nature, structural error "def[ies] analysis by 'harmless-error' standards." *Id.*, 499 U.S. at

8

310, 111 S. Ct. at 1265. The Supreme Court has observed that classification of an error as structural and, therefore, not subject to harmless error review, is the "exception and not the rule." *Rose v. Clark*, 478 U.S. 570, 578, 106 S. Ct. 3101, 3106, 92 L. Ed. 2d 460 (1986). "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Id.*, 478 U.S. at 579, 106 S. Ct. at 3106.

Hicks made a request for psychiatric assistance in order to bolster his insanity defense. The trial court granted the request. At the time the trial court ruled on the motion for a continuance, the psychiatrist, Dr. Bradford, had met with Hicks and performed an evaluation to assist in his defense. Dr. Bradford's preliminary diagnosis of Hicks was intermittent explosive disorder, which, according to Dr. Bradford, rendered Hicks unable to control his impulses. This disorder did not fit within the legal definition of insanity under Georgia law and, therefore, proof of this disorder would not alleviate Hicks's guilt.[3]

---

[3] Georgia law provides two defenses to the offense of murder: insanity and delusional compulsion. The insanity defense provides that "[a] person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence." Ga. Code Ann. § 16-3-2 (1999). Delusional compulsion provides that a person shall not be guilty of a crime if, at the time of the offense, "the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime." Ga. Code Ann. § 16-3-3 (1999). *See Fulghum v. Ford*, 850

"[A] right to which a defendant is not entitled absent some threshold showing [cannot] fairly be defined as basic to the structure of a constitutional trial." *Starr v. Lockhart*, 23 F.3d 1280, 1291 (8th Cir. 1994). Thus, we conclude that an *Ake* error is trial error. Assuming that the trial court's delay in granting psychiatric assistance and its denial of Hicks's motion for a continuance was an *Ake* error, it constitutes trial error because the court must quantitatively assess the error in the context of other evidence presented in order to determine the effect it had on the trial. *Fulminate*, 499 U.S. at 307-08, 111 S. Ct. at 1264. In holding that *Ake* error is trial error, we join several of our sister circuits. *See White v. Johnson*, 153 F.3d 197, 201 (5th Cir. 1998); *Tuggle v. Netherland*, 79 F.3d 1386, 1388 (4th Cir. 1996); *Brewer v. Reynolds*, 51 F.3d 1519, 1529 (10th Cir. 1995); *Starr*, 23 F.3d 1280, 1291. Because an *Ake* error is a trial error, it is subject to harmless error analysis. *See Brecht*, 507 U.S. at 629, 113 S. Ct. at 1717.

B. *Which harmless error analysis applies to Ake violations.*

Based on the foregoing analysis, we must next consider which harmless error standard applies to *Ake* violations. Hicks urges the court to apply the

---

F.2d 1529, 1532 (11th Cir. 1988); *Stevens v. State*, 350 S.E.2d 21, 22 (Ga. 1986) (noting that to support a claim of delusional compulsion, it must appear that (1) the defendant was laboring under a delusion; (2) the criminal act was connected to the delusion; and (3) the delusion was as to a fact which, if true, would have justified the act).

*Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), standard that provides for habeas relief on the basis of a constitutional error unless the respondent can demonstrate that the error was harmless beyond a reasonable doubt. Under the *Chapman* standard, a constitutional error may not be declared harmless if a "reasonable possibility" exists that the "error contributed to the verdict." *Brecht*, 507 U.S. at 637, 113 S. Ct. at 1721. Hicks contends that this standard applies to his case because the state courts never applied the *Chapman* standard during his state post-conviction proceedings. *See Starr*, 23 F.3d at 1292.

Contrary to Hicks's argument, the Supreme Court in *Brecht* directed the federal courts, on habeas review, to apply the harmless error standard set forth in *Kotteakos v. United States*, 328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946), and determine whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623, 113 S. Ct. at 1714 (quoting *Kotteakos*, 328 U.S. at 776, 66 S. Ct. at 1253). The *Brecht* Court opined that "[o]verturning final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under *Chapman* undermines the States' interest in finality and infringes upon their sovereignty over criminal matters." 507 U.S. at 637, 113 S. Ct. at 1721. The Court noted that granting federal collateral relief upon a mere "reasonable possibility" that the error

11

contributed to the verdict would be inconsistent with the historic purpose of habeas review which is "to afford relief to those whom society has 'grievously wronged.'" *Id.* The Court concluded that because "[t]he *Kotteakos* standard is thus better tailored to the nature and purpose of collateral review and more likely to promote the considerations underlying . . . habeas cases," the *Kotteakos* harmless error standard would be applicable to constitutional errors of the trial type. *Id.*, 507 U.S. at 637-38, 113 S. Ct. at 1722.

C. *Whether the Ake violation in this case was harmless.*

A comprehensive review of the record demonstrates that if the trial court's denial of Hicks's motion for a continuance to seek additional evidence regarding his mental condition was an *Ake* error, then it was harmless. At his first state habeas proceeding, and after having the benefit of over two years to develop expert analysis of his sanity, Hicks presented expert evidence regarding his mental condition. During the hearing, Hicks introduced Dr. Bradford's affidavit containing her opinions with respect to Hicks's mental condition after further examination.[4] Hicks also presented the affidavit opinions of neurologist Dr.

_____

[4] Dr. Bradford assisted in Hicks's defense and testified at both the guilt and sentencing phases of his trial. At trial, Dr. Bradford testified that her examination of Hicks revealed evidence of a major psychiatric disorder and possible organic difficulties. (R. Exh. 5 at 773). Dr. Bradford further stated that "[t]he primary major psychiatric illness is an intermittent explosive disorder. I suspect there also may be some neurologic disease. There has not been an opportunity to confirm that hypothesis." (*Id*. at 775). Although Dr. Bradford testified that Hicks could not resist his actions

12

Jonathan Pincus, licensed clinical social worker C. Winter Giddings, and licensed psychologist Dennis A. Bagarozzi regarding Hicks's mental condition. These opinions provide a thorough picture of Hicks's childhood and adolescence and the family dynamics allegedly responsible for the development of Hicks's intermittent explosive disorder. These opinions referred to specific violent and abusive incidents in Hicks's past to which Hicks's family testified at the sentencing phase. Further, Dr. Pincus opined that Hicks suffers from a neurological impairment of organic brain disorder that may be responsible for Hicks's inability to control his explosive behavior. None of the experts' opinions, however, contradicted the evidence presented at trial that Hicks understood the difference between right and wrong at the time that he stabbed the victim and slashed her throat.

Rather than demonstrate a different or more viable insanity defense, these expert opinions relate to the same impulse control disorder testified to by Dr. Bradford at trial. Although the post-conviction expert evidence is more complete, the evidence is identical in kind to the testimony offered by Dr. Bradford at both the guilt and sentencing phases. Indeed, to form her diagnosis of intermittent

that day due to this disorder, she did state that people with this disorder understand the difference between right and wrong. (*Id.* at 808-09). Furthermore, at the sentencing phase, Dr. Bradford testified that nothing changed her diagnosis of intermittent explosive disorder and noted that it did not fit the test for legal insanity under Georgia law. (R. Exh. 6 at 1125). She reiterated that, in her opinion, Hicks could not control the actions that constituted the crime in this case, and she expressed her opinion that the jury should spare Hicks's life. (*Id.* at 1143-44).

13

explosive disorder, Dr. Bradford relied upon the same critical violent incidents in Hicks's history as did the later experts. Accordingly, we conclude that any alleged *Ake* error did not have a "substantial and injurious effect" on the guilty verdict or the death sentence.

## IV. CONCLUSION

We join several of our sister circuits and hold that *Ake* violations are subject to harmless error analysis under the *Brecht* harmless error standard. Applying the *Brecht* standard to the present case, we conclude that the alleged *Ake* error did not have a "substantial and injurious effect" on the outcome of Hicks's trial and sentencing. Accordingly, we affirm the judgment of the district court denying Hicks habeas relief.

**AFFIRMED.**