[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13906

_____

D.C. Docket No. 7:04-cv-02923-RDP


JAMES E. MCWILLIAMS,

Petitioner - Appellant,

versus




COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS, et al.,




Respondents - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(December 16, 2015)

Before TJOFLAT, WILSON, and JORDAN, Circuit Judges.

PER CURIAM:

James Edmund McWilliams, Jr., an inmate on Alabama's death row, appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition challenging his death sentence.

We granted McWilliams a Certificate of Appealability (COA) on four issues: (1) whether the district court erred in holding the state court was not objectively unreasonable in determining McWilliams failed to show a violation of *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087 (1985); (2) whether McWilliams is procedurally barred from arguing the trial court violated his Sixth Amendment rights by denying him a continuance for his sentencing hearing; (3) whether the district court erred in finding the state court was not objectively unreasonable in ruling McWilliams received effective assistance of counsel during the penalty phase of his trial and sentencing; and (4) whether the district court erred in determining the state court was not objectively unreasonable in holding McWilliams's rights under *Griffin v. California*, 380 U.S. 609, 85 S. Ct. 1229 (1965) were not violated.

We hold that the state court did not commit reversible error under 28 U.S.C. § 2254(d) in denying McWilliams's *Ake* claim, his claim of ineffective assistance of counsel during the penalty phase of trial and sentencing, and his *Griffin* claim. We also hold that McWilliams is procedurally barred from arguing the trial court

2

violated his Sixth Amendment rights in denying his motion for continuance. Accordingly, we affirm.

## I.    BACKGROUND

On December 30, 1984, McWilliams entered a convenience store in Tuscaloosa, Alabama, where Patricia Reynolds was working the nightshift by herself.  McWilliams locked the doors behind him and proceeded to rob and brutally rape Ms. Reynolds.  When he was finished, he shot her with a .38 caliber handgun.  Ms. Reynolds died in surgery that night.

McWilliams was arrested driving a stolen car in Ohio with the murder weapon in his possession soon afterwards.  He was identified by eyewitnesses who placed him at the scene.  While in jail in Ohio, McWilliams bragged to other inmates that he robbed, raped, and killed a woman in Alabama.

In the months leading up to the murder, McWilliams was voluntarily attending mental health counseling in the form of couple's therapy with his pregnant wife at the office of Dr. Sherril Rhodes.[1]  After meeting with McWilliams, Dr. Rhodes documented in a report that "there are deeper psychological problems that [McWilliams] is avoiding and hopefully the testing will reveal this."  She also suspected the presence of "psychosis, or possibly manic-depressive disorder."  Dr. Rhodes then set up an appointment for

---

[1] Dr. Rhodes's reports and notes were introduced into evidence during the Rule 32 hearing.

McWilliams to undergo psychological testing with Dr. Marci K. Davis,[2] a clinical psychologist, on October 15, 1984.

Dr. Davis administered the Minnesota Multiphasic Personality Inventory (MMPI) to McWilliams and concluded that McWilliams's MMPI test scores "on the surface indicate that the results are invalid due to faking bad." However, on closer examination, she then determined that "[McWilliams] did tell the truth and took the test in good faith . . . [c]onsequently, we may assume that he is extremely disturbed, has much internal anxiety, and we would expect to find serious pathology." Dr. Davis also recommended McWilliams be admitted to an inpatient treatment facility, evaluated by a psychiatrist for medication, and carefully monitored by counselors. Dr. Davis ended the report by warning other counselors not to meet with McWilliams alone after dark. Nonetheless, McWilliams did not return to counseling before murdering Ms. Reynolds two and a half months later.

## A. The Lunacy Commission

McWilliams's mental health has been frequently contested and repeatedly examined throughout the long history of his case, but the central cause for most of the speculation stems from McWilliams's tendency to malinger, or fake symptoms of his alleged mental illness.

---

[2] Dr. Davis's reports were entered into evidence during the penalty phase.

McWilliams's counsel began investigating McWilliams's mental health less than a month after he was arrested for murdering Ms. Reynolds.  On January 21, 1986, counsel petitioned the Circuit Court of Tuscaloosa County to provide a psychiatric assessment of McWilliams, including an evaluation of his sanity, his competency, and any mitigating circumstances.[3]  The court granted the petition and ordered the State of Alabama (State) to create a "Lunacy Commission" to evaluate McWilliams's mental health at the Taylor Hardin Secure Medical Facility (Taylor Hardin).  The Lunacy Commission reported directly to the court.

On June 4, 1986, the Lunacy Commission presented the court with a three-and-a-half-page report summarizing the conclusions of three doctors serving on the Commission.[4]  All three doctors concluded McWilliams was competent to stand trial, free of mental illness at the time of the crime, and faking psychotic symptoms.

## B.  Trial and Penalty Phase

On August 27, 1986, the jury found McWilliams guilty of murder during robbery in the first degree and murder during rape in the first degree.  The penalty phase took place the following day.  Counsel's strategy during the penalty phase was to present McWilliams as a man who grew up with significant psychological

---

[3] The petition is known as a "Petition for Inquisition Upon Alleged Insane Prisoner."

[4] Four doctors appear in the report, including Dr. Norman G. Poythress, the Director of Clinical Services at Taylor Hardin.  Dr. Poythress did not summarize his own medical conclusions but did ultimately sign the report on May 27, 1986.

5

problems that affected his behavior. Although counsel subpoenaed Dr. Rhodes to testify during the penalty phase, Dr. Rhodes did not respond to the subpoena. Ultimately, only McWilliams and his mother testified for the defense. McWilliams and his mother testified that McWilliams had head injuries as a child and a history of blacking out, hallucinating, chronic headaches, doctor visits, and memory problems. Prior to this testimony, counsel was unaware of these injuries and conditions.

McWilliams was permitted to read Dr. Davis's report and her MMPI test results into the record and explain his mental health issues to the jury. The court also admitted Dr. Davis's report into evidence. However, McWilliams was unable to explain any technical aspects of the report, and when cross-examined, he told the prosecutor that he was not a psychologist. The State then presented two mental health experts from the Lunacy Commission, who each testified that McWilliams was faking psychotic symptoms and was not mentally ill. The jury voted 10 to 2 in favor of the death sentence.

## C. Sentencing Hearing

On September 3, 1986, counsel filed a motion requesting that McWilliams undergo neuropsychological testing for possible organic brain damage, based on the information revealed during the penalty phase about his head injuries. The court granted the request, ordering the Alabama Department of Corrections (DOC)

6

to perform complete neurological and neuropsychological testing on McWilliams.

The court further instructed the DOC to send all results and evaluations to the court

no later than September 25, 1986.

On September 22, 1986, Dr. Paul Bivens, a psychologist employed by the

DOC, wrote the court, explaining that he completed some of the

neuropsychological testing, which indicated "possible organic impairment," but

was unable to complete all the neuropsychological tests. Instead, Dr. Bivens

recommended more testing and advised the court to find a clinical

neuropsychological specialist who could perform the tests independent of the DOC

to "avoid unnecessary conflict."

On September 30, 1986, the trial court appointed Dr. John R. Goff, a

specialist in clinical neuropsychology and the Chief of Psychology at Bryce

Hospital. Dr. Goff met with McWilliams on October 3, 1986, and performed the

neuropsychological testing requested by counsel. Dr. Goff's completed

neuropsychological assessment was delivered to all the parties approximately 48

hours before the sentencing hearing.

Dr. Goff's report was approximately five pages long. He determined that

McWilliams was suffering from organic brain dysfunction and that "organic

personality disorder should be considered." His report also indicated evidence of

malingering but noted it was potentially consistent with a "cry for help posture" or

7

possibly a "fake bad." The report further explained there were some "genuine neuropsychological problems," and Dr. Goff diagnosed McWilliams with "organic personality syndrome."

Counsel subpoenaed McWilliams's medical and psychiatric records multiple times before the penalty phase and well in advance of the sentencing hearing. But, the DOC and Taylor Hardin failed to fully comply with the subpoena until the day of the sentencing hearing. The last of the medical and psychiatric records subpoenaed by counsel arrived at the court on October 8 and October 9, 1986—the morning of the 10 a.m. sentencing hearing.

At the sentencing hearing, counsel moved for a continuance to review the newly arrived records with the assistance of an expert. The court denied the request but invited counsel to review the records at the clerk's office during a brief recess. When the hearing resumed at 2 p.m., the court admitted Dr. Goff's report and all the new records into evidence. Counsel again asked for a continuance. The court again denied the request.

The court found three aggravating circumstances in support of McWilliams's death sentence: (1) McWilliams was previously convicted of a felony involving the use of violence to the person, specifically a robbery and rape he was convicted of on June 26, 1985; (2) the murder was committed during the course of a robbery and rape; and (3) the murder was especially heinous, atrocious,

8

or cruel compared to other capital offenses in light of the brutality of the rape, the execution-type slaying, and McWilliams's behavior after the crime. The court found no mitigating circumstances.

The court determined that "the [d]efendant is not psychotic, either from organic brain dysfunction or any other reason." The court did find that "the defendant possibly has some degree of organic brain dysfunction resulting in some physical impairment, but that does not rise to the level of a mitigating circumstance" and by "a preponderance of the evidence . . . the defendant [is] feigning, faking, and manipulative." The court then sentenced McWilliams to death by electrocution.

## D. Rule 32 Evidentiary Hearing

On April 2, 1997, McWilliams challenged his conviction in a petition under Rule 32 of the Alabama Rules of Criminal Procedure, claiming that his counsel was ineffective for failing to investigate and present mitigating evidence at his penalty phase and sentencing. On June 12, 2000, the Alabama circuit court conducted a four-day evidentiary hearing. In September 2001, the Alabama circuit court denied the petition. In 2004, the Alabama Court of Criminal Appeals reviewed and affirmed the decision.

The Rule 32 evidentiary hearing on McWilliams's post-conviction claims included the testimony of defense expert Dr. George Woods and the State's

9

rebuttal expert, Dr. Karl Kirkland. Dr. Woods reviewed the MMPI performed by Dr. Davis that McWilliams read to the jury during the penalty phase. Dr. Woods explained the test could be confused with exaggerated scores but actually indicated McWilliams had significant psychiatric and psychological problems, including paranoia and mania, as well as "abundant evidence of psychopathology." Dr. Woods agreed with Dr. Davis that McWilliams took the MMPI in good faith. Dr. Woods also examined the 1986 MMPI testing performed at Taylor Hardin, which the State used during the penalty phase. He explained that the results indicated a cry for help with severe psychopathology and did not necessarily mean McWilliams faked his symptoms.

Dr. Woods also reviewed Dr. Goff's report and testified that the results revealed symptoms of a psychiatric disorder, but because neuropsychological impairments change over time, McWilliams's neuropsychological function was somewhat restored as of 2000. Dr. Woods further testified that he reviewed the DOC records, and the records revealed McWilliams was medicated with antipsychotics and antidepressants throughout his entire incarceration. Dr. Woods stated that, in examining the DOC records, the administration of medication was consistent with the presentation of symptoms that required psychiatric treatment.

`    Dr. Woods ultimately diagnosed McWilliams with bipolar disorder, with symptoms of mania, hypomania, and depression. Dr. Woods also concluded that

10

McWilliams was suffering from bipolar disorder on the night of the crime. Dr. Karl Kirkland, a forensic psychologist, testified that he disagreed with Dr. Woods's diagnosis. Dr. Kirkland agreed with the evaluation of the Taylor Hardin doctors that McWilliams was feigning psychiatric symptoms and that his behavior was more appropriately categorized as a character disorder.

## II.    PROCEDURAL HISTORY

McWilliams's conviction and death sentence were affirmed on direct appeal by the Alabama Court of Criminal Appeals and the Alabama Supreme Court. *See McWilliams v. State*, 640 So. 2d 982 (Ala. Crim. App. 1991), *aff'd in part*, *remanded in part sub nom.*, *Ex parte McWilliams*, 640 So. 2d 1015 (Ala. 1993), *on remand to sub nom.*, *McWilliams v. State*, 640 So. 2d 1025 (Ala. Crim. App. 1994), *opinion after remand*, 666 So. 2d 89 (Ala. Crim. App. 1994), *aff'd sub nom.*, *Ex part McWilliams*, 666 So. 2d 90 (Ala. 1995), *cert. denied sub nom.*, *McWilliams v. Alabama*, 516 U.S. 1053, 116 S. Ct. 723 (1996).

The Alabama circuit court entered its final order denying McWilliams's Rule 32 petition in September 2001, and the Alabama Court of Criminal Appeals affirmed the denial. *See McWilliams v. State*, 897 So. 2d 437 (Ala. Crim. App. 2004). On September 24, 2004, the Alabama Supreme Court denied McWilliams's petition for a writ of certiorari on his Rule 32 petition.

11

McWilliams then turned to the federal courts.  On October 6, 2004, he filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Alabama.  The district court assigned a magistrate judge to review McWilliams's petition and submit a recommendation.  On February 1, 2008, the magistrate judge issued a report and recommendation denying all of McWilliams's claims.  On August 25, 2010, the district court entered a memorandum opinion adopting the magistrate judge's conclusions.  The district court further addressed specific objections McWilliams raised to the magistrate judge's report and recommendation and then entered an order dismissing McWilliams's habeas petition with prejudice and denying his application for a COA.

This court granted a COA on whether the district court improperly overruled all of McWilliams's objections to the magistrate judge's report and recommendation without specifically acknowledging certain objections.  On September 10, 2012, we vacated the district court's decision and remanded McWilliams's case to the district court with instructions to resolve all the claims in his habeas petition.  The district court then entered a memorandum opinion on April 17, 2013 overruling all of McWilliams's objections to the magistrate judge's report, adopting the report in full, and denying McWilliams's habeas petition.  On October 7, 2013, the district court again denied McWilliams's request for a COA.

McWilliams then filed an application for a COA in this court. On December 16, 2013, we granted McWilliams a COA.

## III. STANDARD OF REVIEW

"When examining a district court's denial of a . . . habeas petition, we review questions of law and mixed questions of law and fact *de novo,* and findings of fact for clear error." *Connor v. Sec'y, Fla. Dep't of Corr.*, 713 F.3d 609, 620 (11th Cir. 2013) (internal quotation marks omitted).

"Because [McWilliams] filed his federal petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death [Penalty] Act of 1996 (AEDPA)." *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). When a state court has denied a claim on the merits, "the standard a petitioner must meet to obtain federal habeas relief was intended to be, and is, a difficult one." *See Johnson v. Sec'y, DOC*, 643 F.3d 907, 910 (11th Cir. 2011) (citing *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 786 (2011)).

The "purpose of AEDPA's" amendments to § 2254 "is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 565 U.S. __, __, 132 S. Ct. 38, 43–44 (2011) (internal quotation marks omitted). Therefore, federal review of final state court decisions under § 2254 is

13

"greatly circumscribed" and "highly deferential." *See Hill v. Humphrey*, 662 F.3d 1335, 1343 (11th Cir. 2011) (en banc) (internal quotation marks omitted). AEDPA only allows federal courts to grant relief for habeas claims decided by a state court on the merits if the state court's resolution of the claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding.

28 U.S.C. § 2254(d).

Under AEDPA, "the state court's application of governing [F]ederal law . . . must be shown to be not only erroneous, but objectively unreasonable." *Waddington v. Sarausad*, 555 U.S. 179, 190, 129 S. Ct. 823, 831 (2009) (internal quotation marks omitted); *see also Williams v. Taylor*, 529 U.S. 362, 410–11, 120 S. Ct. 1495, 1522 (2000) ("[A]n *unreasonable* application of [F]ederal law is different from an *incorrect* application of [F]ederal law."). This is a "substantially higher threshold" than when only a showing of erroneousness is required. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007). When assessing the state court's decision, we must consider the record the court had before it. *Cullen v. Pinholster*, 563 U.S. 170, __, 131 S. Ct. 1388, 1400 (2011). It is the petitioner's burden to demonstrate that the state court applied the relevant clearly

14

established law to that record "in an objectively unreasonable manner."

*See Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S. Ct. 357, 360 (2002) (per

curiam).  Given this determination is objective, a federal court may not issue a writ

of habeas corpus simply because "it concludes in its independent judgment" that

the state court was incorrect.  *See Williams*, 529 U.S. at 409–11, 120 S. Ct. at 1522.

Our review of a petitioner's claim is further limited under § 2254(e)(1) by "a

presumption of correctness [that] applies to the factual findings made by state trial

and appellate courts."  *Rose v. McNeil*, 634 F.3d 1224, 1241 (11th Cir. 2011)

(internal quotation marks omitted).  "This deference requires that a federal habeas

court more than simply disagree with the state court before rejecting its factual

determinations."  *Id.* (internal quotation mark omitted).  "Instead, it must conclude

that the state court's findings lacked even fair support in the record."  *Id.* (internal

quotation mark omitted).  The petitioner has "the burden of rebutting the

presumption of correctness by clear and convincing evidence."  28 U.S.C. §

2254(e)(1).

## IV.  DISCUSSION

### A. Alabama's Application of *Ake*

McWilliams contends the State deprived him of due process under *Ake*

because the State did not provide him the meaningful assistance of an independent

psychiatric expert at his sentencing hearing.

15

Under *Ake*, "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the [s]tate must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83, 105 S. Ct. at 1096. This right "extends to the sentencing phase of a criminal case." *Blanco v. Sec'y, Fla. Dep't of Corr.*, 688 F.3d 1211, 1223 (11th Cir. 2012) (internal quotation marks omitted). However, *Ake* cautions that a defendant does not have "a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Ake*, 470 U.S. at 83, 105 S. Ct. at 1096. Rather, *Ake* entitles the defendant access to a "competent psychiatrist." *Id.* "[T]he decision on how to implement this right" is left "to the [s]tate." *Id.*

McWilliams first argues that he was denied the assistance contemplated by *Ake* because he was not provided an "expert of his own." Specifically, McWilliams asserts that he was denied such an expert because Dr. Goff's assistance was "equally disseminated to all parties." The State contends there is no clearly established Federal law that requires it to provide a partisan mental health expert to the defense and, therefore, McWilliams is not entitled to federal habeas relief on this basis.

16

In some jurisdictions, a court-appointed neutral mental health expert made available to all parties may satisfy *Ake*. *See Miller v. Colson*, 694 F.3d 691, 697–99 (6th Cir. 2012) (discussing the split amongst Sixth Circuit decisions that address whether a neutral mental health expert satisfies *Ake*), *cert. denied*; *Granviel v. Lynaugh*, 881 F.2d 185, 191–92 (5th Cir. 1989) (holding that *Ake* is met when the government provides a defendant with neutral psychiatric assistance), *cert. denied*. Other circuits have held that the state must provide a non-neutral mental health expert to satisfy *Ake*. *See United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985) (holding that a defendant is entitled to independent, non-neutral psychiatric assistance); *Smith v. McCormick*, 914 F.2d 1153, 1158 (9th Cir. 1990) ("[U]nder *Ake*, evaluation by a 'neutral' court psychiatrist does not satisfy due process."). However, the United States Supreme Court has thus far declined to resolve this disagreement among the circuits. *See Miller*, 694 F.3d at 697 n. 6; *Granviel v. Texas*, 493 U.S. 963, 110 S. Ct. 2577 (1990) (denying certiorari). As a result, the State's provision of a neutral psychologist would not be "contrary to, or involve[] an unreasonable application of, clearly established Federal law." *See* 28 U.S.C. § 2254(d)(1). Therefore, McWilliams's argument fails.

McWilliams next contends that Dr. Goff's late arrival to the proceedings denied him due process under *Ake*. The State asserts a defendant is only entitled to

17

assistance from a psychiatrist under *Ake* and the trial court's appointment of Dr. Goff satisfied this requirement.

McWilliams was entitled access to a "competent psychiatrist" to assist him in the development of his defense. *See Ake*, 470 U.S. at 83, 105 S. Ct. at 1096. The State appointed Dr. Goff to examine McWilliams and produce a report. Nothing in the record suggests that Dr. Goff lacked the requisite expertise to examine McWilliams and generate a report. While Dr. Goff provided the report to McWilliams only a few days before the sentencing hearing, McWilliams could have called Dr. Goff as a witness or contacted him prior to the completion of the report to ask for additional assistance. McWilliams's failure to do so does not render Dr. Goff's assistance deficient. Moreover, the report was admitted into evidence and considered by the court at sentencing, demonstrating the defense utilized Dr. Goff's assistance. Thus, the State provided McWilliams access to a competent psychiatrist, and McWilliams relied on the psychiatrist's assistance.

Given the deference owed to the state court, its determination that *Ake* was satisfied under these circumstances was not objectively unreasonable. Therefore, we hold that the State's adjudication of McWilliams's *Ake* claim was not contrary to or an unreasonable application of clearly established Federal law.

Even assuming an *Ake* error occurred, relief may only be granted if the error had a "substantial and injurious effect or influence" on the outcome of

McWilliams's case. *See Hicks v. Head*, 333 F.3d 1280, 1286–87 (11th Cir. 2003) (internal quotation marks omitted). The jury at McWilliams's penalty phase voted 10 to 2 in favor of the death penalty. The trial judge reviewed Dr. Goff's report and took into account the possibility of organic brain damage but also noted that, throughout McWilliams's medical records, different psychologists and psychiatrists describe him as a malingerer. For example, the mental health professionals on the Lunacy Commission determined McWilliams was a malingerer and a faker; Dr. Goff's report indicated that McWilliams was malingering on some level; Dr. Kirkland determined McWilliams was faking symptoms; and even Dr. Woods, McWilliams's post-conviction expert admitted McWilliams has a history of malingering and can be deceitful and manipulative. Moreover, Dr. Woods was the only doctor who diagnosed McWilliams as bipolar—a diagnosis contested by Dr. Kirkland. Based on a review of this and other evidence, the trial judge found that McWilliams's "aggravating circumstances overwhelmingly outweighed the mitigating circumstances."

A few additional days to review Dr. Goff's findings would not have somehow allowed the defense to overcome the mountain of evidence undercutting his claims that he suffered from mental illness during the time of the crime. Accordingly, even assuming the state court committed an *Ake* error, the error did not have a substantial and injurious effect on McWilliams's sentence.

19

## B. Procedural Default

McWilliams argued to the district court that he was denied his Sixth Amendment right to effective assistance of counsel when the trial court refused his motion for continuance of the sentencing hearing. However, the magistrate judge determined McWilliams did not properly raise this claim before the Alabama Supreme Court and, in turn, McWilliams failed to exhaust his state remedies. Therefore, the district court determined this claim is procedurally barred.

When a habeas claim arises in state court, the petitioner must exhaust his state remedies. 28 U.S.C. § 2254(b)(1)(A). In order to satisfy the exhaustion requirement, a petitioner must "fairly presen[t] federal claims to the state courts in order to give the [s]tate the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 888 (1995) (per curiam) (internal quotation marks omitted). The petitioner must apprise the state court of "the federal constitutional issue," not just the underlying facts of the claim or a "somewhat similar state-law claim." *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (internal quotation marks omitted). The Supreme Court has observed that "Congress surely meant that exhaustion be serious and meaningful." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10, 112 S. Ct. 1715, 1720 (1992). The Court further explained:

> [c]omity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court. Just

20

> as the [s]tate must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the [s]tate a full and fair opportunity to address and resolve the claim on the merits.

*Id.*; *see also Henderson v. Campbell*, 353 F.3d 880, 898 n. 25 (11th Cir. 2003).

McWilliams first raised his ineffective assistance of counsel claim based on the motion for continuance in his direct appeal to the Alabama Court of Criminal Appeals. The court denied this claim because McWilliams "demonstrated no prejudice." *McWilliams v. State*, 640 So. 2d 982, 993 (Ala. Crim. App. 1991). McWilliams then petitioned the Alabama Supreme Court for a writ of certiorari. In his petition, McWilliams asserted: (1) his rights were violated "under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution" and (2) the Alabama Court of Criminal Appeals erred by holding he had not demonstrated prejudice. The Alabama Supreme Court declined to review the petition.

McWilliams only mentioned his motion for continuance in Sections VIII and IX of his brief to the Alabama Supreme Court. But, he failed to argue in either of those Sections that the denial of the motion violated his right to effective assistance of counsel. Although Section VIII asserted the trial court abused its discretion in denying McWilliams's motion for continuance, McWilliams did not allege the denial violated his right to effective assistance of counsel, and he did not mention the phrase "effective assistance of counsel" or cite *Strickland v. Washington*, 466

21

U.S. 668, 104 S. Ct. 2052 (1984). McWilliams also did not mention *Strickland* or use the phrase "effective assistance of counsel" in Section IX of the brief.

Accordingly, McWilliams did not apprise the state court of his constitutional claim regarding his motion for continuance of the sentencing hearing. The district court did not err in concluding McWilliams's ineffective assistance of counsel claim is procedurally barred.

## C. Ineffective Assistance of Counsel During the Penalty Phase of Trial and Sentencing

McWilliams also claims counsel was ineffective for failing to investigate or present mitigating evidence during the penalty phase of his trial and sentencing.

The district court's denial of McWilliams's habeas corpus petition on this issue is reviewed de novo. *See Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010).

As with McWilliams's *Ake* claim, we may only grant habeas relief on this issue if the State's resolution of the Rule 32 proceedings and subsequent appeals resulted in a decision that was either (1) "contrary to or involved an unreasonable application of, clearly established Federal law," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d). Therefore, in contrast to our review of a *Strickland* claim on direct appeal from a federal district court, we must defer to the state court unless its application of *Strickland* was unreasonable. *See Richter*, 562

U.S. at 101, 131 S. Ct. at 785. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 786 (internal quotation marks omitted). Furthermore, as discussed above, we must presume the state court's factual findings to be correct unless the petitioner rebuts this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"The object of an ineffectiveness claim is not to grade counsel's performance." *See Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069; *White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir. 1992) ("We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately."). The issue is "not what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987) (internal quotation marks omitted).

To establish that his counsel provided constitutionally ineffective assistance, McWilliams must show both that "counsel's performance was deficient" and that the deficiency "prejudiced [his] defense." *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Deficient performance is representation that falls "below an objective standard of reasonableness" measured by "prevailing professional norms." *See id.* at 687–88, 104 S. Ct. at 2064–65. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of

23

reasonable professional judgment." *Id.* at 690, 104 S. Ct. at 2066. Thus, "to show that counsel's performance was unreasonable, the petitioner must establish that *no competent counsel would have taken the action that his counsel did take*." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001).

Given the strong presumption of reasonableness under *Strickland* and the requirements of AEDPA, our review of counsel's performance is "doubly deferential." *See Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420 (2009). McWilliams's claim cannot succeed unless he provides affirmative evidence of ineffectiveness—an "absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Burt v. Titlow*, 571 U.S. __, 134 S. Ct. 10, 17 (2013) (internal quotation marks omitted).

McWilliams asserts counsel was ineffective because counsel failed to investigate and present evidence of McWilliams's family history and mental health. According to McWilliams, the mitigation evidence presented at his post-conviction hearings shows the evidence counsel offered during trial and sentencing was deficient. But, the Alabama Court of Criminal Appeals determined that counsel diligently investigated and presented evidence about McWilliams's family history and mental health, and this conclusion does not unreasonably contravene clearly established Federal law.

First, counsel spoke to McWilliams's mother, father, and wife about McWilliams's family history. Counsel also telephoned McWilliams's friends. Counsel testified at the Rule 32 evidentiary hearing that he would have investigated any other potentially useful sources of information or individuals mentioned to him as possible mitigation witnesses. Moreover, McWilliams's mother and McWilliams testified extensively about his childhood during the penalty phase.

Second, counsel: (1) requested that McWilliams be evaluated by the Lunacy Commission; (2) retrieved McWilliams's medical records, despite the DOC and Taylor Hardin ignoring his subpoenas; (3) obtained the assistance of a volunteer psychologist, (4) arranged for McWilliams to be evaluated by Dr. Goff, and (5) subpoenaed McWilliams's previous psychologist to testify during the penalty phase. Although the subpoenaed psychologist did not respond to the subpoena, counsel testified at the Rule 32 hearing that he made a strategic decision not to enforce the subpoena because forcing a doctor into court could backfire. Furthermore, although counsel did not learn of the head injuries McWilliams sustained as a child until the penalty phase of trial, the Lunacy Commission reported no evidence of a brain injury. Therefore, it was reasonable for counsel to conclude that McWilliams had no such injuries. Nevertheless, once counsel learned of the head injuries, he immediately moved for and obtained a

25

neuropsychological report prior to the sentencing hearing. At the hearing, the report was admitted into evidence.

In undertaking such efforts, counsel's investigation of McWilliams's family history and mental health was reasonable. *See Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1241–43 (11th Cir. 2010) (finding that counsel performed an adequate mitigation investigation where he gathered medical records and assisted with the development of an expert evaluation report). In addition, given McWilliams's questionable mental health history and the limited value of his family background information, it cannot be found that "no competent counsel" would have adopted the same approach as counsel. *See Grayson*, 257 F.3d at 1216. While counsel may have been able to present more mitigation evidence, this alone does not render his decision not to do so unreasonable. *See Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (en banc) ("That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel.").

On this record, McWilliams has not met his AEDPA burden. He has not shown that counsel's performance was so deficient as to overcome the "doubly deferential" standard required for relief. *See Knowles*, 556 U.S. at 123, 129 S. Ct.

26

at 1420.  We therefore reject McWilliams's claim of ineffective assistance of counsel.

### D. Prosecutorial Misconduct

Finally, McWilliams alleges the prosecutor's comments during closing argument on his failure to testify at trial violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  McWilliams contends these statements denied him a fair trial because they constituted improper burden-shifting arguments.

McWilliams's claim of prosecutorial misconduct involves mixed questions of law and fact and, therefore, is reviewed de novo.  *See United States v. Noriega*, 117 F.3d 1206, 1218 (11th Cir. 1997).

The Fifth and Fourteenth Amendments "forbid[] either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  *Griffin*, 380 U.S. at 615, 85 S. Ct. at 1233.  However, "a prosecutor's indirect reference to a defendant's failure to testify is not reversible error per se."  *United States v. Delgado*, 56 F.3d 1357, 1368 (11th Cir. 1995).  This court has "strictly enforced the requirement that a defendant show that the allegedly offensive comment was either manifestly intended to be a comment on the defendant's silence or that the comment naturally and necessarily related to the defendant's silence."  *Isaacs v. Head*, 300 F.3d 1232, 1270 (11th Cir. 2002).  "A

27

comment on the failure of the *defense*, as opposed to that of the *defendant*, to counter or explain the testimony presented or evidence introduced is not [improper burden-shifting]." *Duncan v. Stynchcombe*, 704 F.2d 1213, 1215–16 (11th Cir. 1983) (per curiam).

Prosecutorial misconduct during closing argument, including an inappropriate burden-shifting argument, only warrants a new trial if the remarks were "improper" and "prejudicially affect[ed]" the defendant's "substantial rights." *See United States v. Wilson*, 149 F.3d 1298, 1301 (11th Cir. 1998) (internal quotation marks omitted), *aff'd*, 37 F. App'x 978 (11th Cir. 2002). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would be different." *Id.* (alterations in original) (internal quotation marks omitted).

McWilliams challenges the following comment made by the prosecution:

> You know, one thing I do note that neither of the defense attorneys have talked about in the evidence or really dwelt on: they did not talk about that gun in that car right beside the man underneath the armrest, loaded, up in Ohio. And they did not talk about the bullets in his pocket; and they did not talk about the bullets down in the floorboard of the car—the ones he said he was biting on. He said he knew those were there, but he didn't know about the gun being there. Why did he have bullets in his pocket if he didn't know anything about any of this? There is no good reason, explanation, that indicates anything other than guilt in this case. There is no other explanation for it, and you have not heard an explanation; the evidence doesn't show any other explanation for it.

28

*Ex parte McWilliams*, 640 So. 2d 1015, 1018–19 (Ala. 1993).

The Alabama Court of Criminal Appeals found that the prosecutor's comment was not "intended to be a reference to [McWilliams's] silence." *McWilliams*, 640 So. 2d at 1010. Furthermore, the Alabama Supreme Court determined that "[t]his is clearly a comment on the failure of *defense counsel* to explain testimony or evidence." *Ex parte McWilliams*, 640 So. 2d at 1019–20. The prosecutor began his comment by telling the jury he was referring to what the *defense attorneys* did not talk about "in the *evidence*." While the statement, "[t]here is no good reason, explanation that indicates anything other than guilt in this case," by itself could be taken to mean the defendant did not provide an explanation himself, the prosecutor followed the comment by stating that "the evidence doesn't show any other explanation for it." In light of the entire statement, it is clear that the prosecutor intended the statement to be directed at counsel, and the comment naturally and necessarily related to counsel's arguments regarding the evidence introduced at trial, not McWilliams's constitutionally protected silence.

Accordingly, McWilliams has failed to show the state court's "was contrary to or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." *See* 28 U.S.C. § 2254(d).

29

## V.    CONCLUSION

For the foregoing reasons, we find as follows.  First, the state court did not commit reversible error under 28 U.S.C. § 2254(d) in denying McWilliams's (1) *Ake* claim, (2) his claim of ineffective assistance of counsel during the penalty phase of trial and sentencing, and (3) his claim that the prosecutor improperly commented on his failure to testify.  Second, McWilliams's ineffective assistance of counsel claim based on the trial court's denial of his motion for continuance of the sentencing hearing is procedurally defaulted.  Therefore, we affirm the district court's denial of McWilliams's petition for a writ of habeas corpus.

**AFFIRMED.**

JORDAN, Circuit Judge, concurring.

I concur in the judgment denying federal habeas corpus relief to Mr. McWilliams. My reasons are as follows.

• The ineffective assistance of counsel claim based on the denial of the continuance of the sentencing hearing was not exhausted under 28 U.S.C. § 2254(b)(1) because Mr. McWilliams did not present it in his petition for discretionary review to the Alabama Supreme Court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

• The ineffective assistance of counsel claim related to the investigation and presentation of mitigating evidence at the penalty phase fails because counsel conducted a competent mental health investigation; had Mr. McWilliams evaluated not once, but twice; and presented mitigating evidence (including Dr. Goff's report) at the sentencing hearing. *See Bobby v. Van Hook*, 558 U.S. 4, 9-12 (2009).

• The claim based on a violation of *Griffin v. California*, 380 U.S. 609 (1965), is a close one, as shown by the fact that two judges on the Alabama Court of Criminal Appeals sided with Mr. McWilliams. See *McWilliams v. State*, 640 So.2d 982, 1014 (Ala. Cr. App. 1991) (Bowen, J., dissenting in part). But given AEDPA deference, the finding by the Court of Criminal Appeals that the prosecutor's argument was not a comment on Mr. McWilliams' right to remain silent was a reasonable application of *Griffin*.

31

• The claim based on *Ake v. Oklahoma*, 470 U.S. 68 (1985), is also close, for the reasons outlined in Judge Wilson's dissent. At the end of the day, however, I think the claim fails. First, the Supreme Court has not addressed whether *Ake* is satisfied by the court appointment of a neutral mental health expert. As a result, I cannot say that the Court of Criminal Appeals unreasonably applied, or ruled in a way that was contrary to, *Ake*. *See Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015). Second, I do not think Mr. McWilliams has shown a "substantial and injurious effect" from any *Ake* violation. *See Fry v. Pliler*, 551 U.S. 112, 119-20 (2007). I reach this conclusion in part because Mr. McWilliams did not present Dr. Goff as a witness at the state post-conviction hearing. Given this void in the record, it is difficult for me to conclude that Mr. McWilliams has met his burden on prejudice, as we do not know how additional time with Dr. Goff (and his report) would have benefited the defense. My point is not that a capital defendant must always present the testimony of his medical expert at a post-conviction hearing to prove prejudice under *Ake*. It is, instead, that in this case Dr. Goff's absence is one of the reasons that Mr. McWilliams cannot show a "substantial and injurious effect."

WILSON, Circuit Judge, dissenting:

Defendants facing the death penalty—the "gravest sentence our society may impose"—must have "a fair opportunity to show that the Constitution prohibits their execution." *Hall v. Florida*, 572 U.S. __, __, 134 S. Ct. 1986, 2001 (2014). This means that they must receive "meaningful access to justice" during their capital proceedings. *See Ake v. Oklahoma*, 470 U.S. 68, 76–77, 105 S. Ct. 1087, 1092–1093 (1985). In *Ake*, the Supreme Court held that this guarantee requires states to provide defendants meaningful "access to a psychiatrist[]" when their mental health "is likely to be a significant factor" at trial or sentencing. *See id.* at 74–77, 105 S. Ct. at 1091–1093. James Edmund McWilliams, Jr. was denied this basic right.

McWilliams's mitigation case depended on the judge and jury's conclusions about his mental health. Nonetheless, McWilliams did not receive any expert assistance during his sentencing before the jury. And, at his judicial sentencing hearing, he again was denied assistance, absent an expert report provided hours beforehand from a mental health expert who did not have the opportunity to review his full psychiatric history. This was not meaningful assistance. For these reasons, Alabama's resolution of McWilliams's *Ake* claim was "an unreasonable application of clearly established Federal law." 28 U.S.C. § 2254(d)(1). Therefore, I would reverse the district court's denial of McWilliams's habeas

petition with directions to remand the case to state court for a new sentencing hearing.

## I.

The penalty phase of McWilliams's trial began on August 28, 1986. On that date, a sentencing hearing was held before the jury. Although McWilliams received psychological services in the months leading up to the murder of Patricia Reynolds and his mental health history formed the basis of his mitigation case, the trial court did not provide him access to a psychiatrist during this phase. Moreover, defense counsel subpoenaed Dr. Sherril Rhodes to testify at the hearing, but Dr. Rhodes did not appear. Ultimately, McWilliams and his mother were the only witnesses for the defense during the penalty phase. Meanwhile, the State proffered multiple expert psychiatric witnesses.

McWilliams's judicial sentencing hearing was scheduled for October 9, 1986. On September 30, 1986, the trial court appointed a clinical neuropsychologist, Dr. John R. Goff—a state employee—to examine McWilliams and generate a report. Dr. Goff provided his report to both the prosecution and defense on October 7, 1986. The report stated that McWilliams's "neuropsychological assessment [wa]s reflective of organic brain dysfunction which is localized to the right cerebral hemisphere." It also found there was evidence of "cortical dysfunction attributable to the right cerebral hemisphere

dysfunction." The report concluded that "in light of [McWilliams's] obvious neuropsychological deficit, organic personality syndrome should be considered." The next day, on October 8, the court advised defense counsel that it had just received McWilliams's medical and psychiatric Department of Corrections (DOC) records, which counsel had subpoenaed multiple times. However, various records remained missing. The DOC produced more records on October 9—the day of the sentencing hearing.

Faced with less than 48 hours to review this new information and consider its usefulness, defense counsel sought more time to secure the services of an expert to assist him in evaluating the records. Counsel stated to the court:

> [G]iven the nature of this case . . . it is necessary on my part to have someone else review these findings. . . . [W]e are unable to present anything because of the shortness of time between which this material was supplied to us and the date of the hearing. . . . It is the position of the Defense that we received these records at such a late date, such a late time that it has put us in a position as layman, with regard to psychological matters, that we cannot adequately make a determination as to what to present to The [sic] Court with regards to the particular deficiencies that the Defendant has. . . . [W]e really need an opportunity to have the right type of experts in this field, take a look at all of those records and tell us what is happening with him. And that is why we renew the Motion for a Continuance.

Nevertheless, the court denied the Motion for Continuance.

35

This sequence of events does not constitute the meaningful access to a mental health expert contemplated by *Ake*.

## II.

### A. *An Unreasonable Application of* Ake

*Ake* is unequivocal: due process requires states to provide a defendant the access to a psychiatrist necessary to assure him "a fair opportunity to present his defense" and the ability "to participate meaningfully in [his] judicial proceeding[s]." *See Ake*, 470 U.S. at 76–77, 83–84, 105 S. Ct. at 1092–93, 1096–97; *Medina v. California*, 505 U.S. 437, 444–45, 112 S. Ct. 2572, 2577 (1992) ("The holding in *Ake* can be understood as an expansion of earlier due process cases holding that an indigent criminal defendant is entitled to the minimum assistance necessary to assure him a fair opportunity to present his defense and to participate meaningfully in the judicial proceeding." (internal quotation marks omitted)). Accordingly, "[t]he [s]tate must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination *and assist in evaluation, preparation, and presentation of the defense*." *Ake*, 470 U.S. at 83, 105 S. Ct. at 1096 (emphasis added). This requirement applies to any trial or sentencing proceedings in which the defendant's mental health will be a

significant factor.[1]  *See id.* at 83–84, 105 S. Ct. at 1096–97; *Blanco v. Sec'y, Fla. Dep't of Corr.*, 688 F.3d 1211, 1223 (11th Cir. 2012).

Providing further insight into the type of assistance compelled by *Ake*, the *Ake* Court explained the role of the psychiatrist in this context as: (1) gathering facts—through an examination, interviews, and elsewhere—to share with the judge and jury; (2) analyzing the information gathered and rendering conclusions about the defendant's mental condition; (3) assisting the defendant with identifying the probative questions to ask of the prosecution's psychiatrists; (4) assisting the defendant with understanding the opinions proffered by the other party's psychiatrists; and (5) helping lay jurors make a sensible and educated determination about the defendant's mental condition.  *See Ake*, 470 U.S. at 80–81, 105 S. Ct. at 1095.

Thus, *Ake* does not simply entitle a criminal defendant to expert assistance; the assistance must be meaningful.  McWilliams was denied this right during both the penalty phase and judicial sentencing hearing.

---

[1] Here, it was clear that McWilliams's mental health was a significant factor in his sentencing proceedings, including both the penalty phase and judicial sentencing hearing.  There is no dispute among the parties that McWilliams's rights under *Ake* were triggered for the judicial sentencing hearing.  Moreover, at the penalty phase, the trial court was aware of the substantial role that McWilliams's mental health was to play in his case for mitigation—the defense informed the court that it subpoenaed a mental health expert to testify at the penalty phase hearing, and at the hearing, the State offered expert psychiatric testimony, and McWilliams's mother testified about McWilliams's childhood head trauma.

1. <u>As with the Defendant in *Ake*, McWilliams Was Not Provided Any Psychiatric Assistance When He Appeared Before the Jury for Sentencing.</u>

The facts surrounding McWilliams's penalty phase hearing mirror those that resulted in a denial of due process in *Ake*. After the defendant in *Ake* was found guilty, he appeared before the jury for sentencing. During this proceeding, the prosecution relied on testimony from state psychiatrists who examined the defendant, but the defendant had "no expert witness to rebut this testimony or to introduce on his behalf evidence in mitigation of his punishment." *Id.* at 73, 105 S. Ct. at 1091. The Court held that the defendant was denied due process as a result of the state's failure to provide him access to a psychiatrist at the proceeding. *Id.* at 86–87, 105 S. Ct. at 1098. Likewise, McWilliams appeared before the jury for sentencing—his "penalty phase" hearing—after his verdict was rendered, and the trial court did not provide him any access to a psychiatrist, leaving him with no means to rebut the State's expert testimony. Therefore, as in *Ake*, McWilliams was denied due process when he appeared before the jury for sentencing.

2. <u>The Trial Court Failed to Provide McWilliams Meaningful Assistance at the Judicial Sentencing Hearing.</u>

The trial court's failure during the penalty phase could have been remedied through the provision of meaningful expert assistance for the judicial sentencing hearing. But, the trial court did not provide McWilliams such assistance, thereby denying him due process.

38

First, Dr. Goff's late arrival to the proceedings rendered any assistance he could provide a nullity, not the meaningful assistance contemplated by *Ake*. This court has previously explained that a psychiatric examination must be done "at such a time to allow counsel a reasonable opportunity to use the psychiatrist's analysis in the preparation and conduct of the defense." *Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir. 1985). Dr. Goff was unable to provide assistance to the defense until less than 48 hours before the judicial sentencing hearing—when his report and findings were finally completed. This was an inadequate amount of time for Dr. Goff to educate defense counsel on the report, assist counsel in developing a strategy and testimony for the hearing, and/or help counsel understand and respond to the testimony put forth by the State's expert witnesses at the penalty phase. *See Ake*, 470 U.S. at 80–81, 105 S. Ct. at 1095. In light of the technical nature of the report and McWilliams's complex mental health history, the defense did not even have enough time to achieve the basic level of understanding of the report needed to use it at the hearing. Moreover, in the hours leading up to the hearing, defense counsel had to determine how the newly provided DOC records related to the report's findings. Thus, any assistance received from Dr. Goff's report was superficial and far from meaningful.

Second, Dr. Goff could not provide competent assistance because he did not have the benefit of reviewing critical mental health records. Despite defense

39

counsel's multiple requests to the DOC, the DOC did not produce McWilliams's

mental health records until hours before the sentencing hearing—after Dr. Goff's

report was completed.  These records showed, *inter alia*, that McWilliams was

medicated with antipsychotics and antidepressants while incarcerated.  Without

access to these highly relevant records, Dr. Goff could not have provided a

meaningful analysis.[2]  *See Blake*, 758 F.2d at 532–33 (finding the defendant was

denied due process because the state did not produce records relevant to his expert

psychiatrist's testimony until the day before trial); *Starr v. Lockhart*, 23 F.3d 1280,

1288–89 (8th Cir. 1994) (holding that the defendant was denied due process under

*Ake* where the psychiatrist was merely "[un]able to interpret or explain" relevant

information, including the results of past mental health examinations).

     Third, in order to obtain meaningful assistance from a psychiatrist, the

defense must be able to speak freely with the psychiatrist about its case, without

the prosecution's access to the discussion.  As McWilliams points out in his brief,

*Ake* is not satisfied by an expert "who would provide . . . assistance to the

defendant, only to cross the aisle and disclose to the State the future cross-

---

[2] Additionally, under these circumstances—where the factfinder is deprived of expert testimony on parts of the defendant's psychiatric history—the factfinder "loses the substantial benefit of potentially probative information," resulting in "a much greater likelihood of an erroneous decision." *See Ford v. Wainwright*, 477 U.S. 399, 414, 106 S. Ct. 2595, 2604 (1986) (plurality opinion) (discussing the application of *Ake*).

examination of defense counsel." However, as a neutral expert, Dr. Goff was free to make such a disclosure.

Relatedly, *Ake* requires that a defendant receive an opportunity—through an independent psychiatrist—to "develop[] his *own* psychiatric evidence to rebut the [State's] evidence and to enhance his defense in mitigation." *Tuggle v. Netherland*, 516 U.S. 10, 13, 116 S. Ct. 283, 285 (1995) (per curiam) (emphasis added). In addition to being a state employee with the ability to speak to the prosecution about his report and the defense's case, Dr. Goff provided his report to the defense and prosecution at the same time. Clearly, the report did not serve as McWilliams's "own psychiatric evidence."[3]

In sum, far from simply being denied the chance to choose his own psychiatrist or receive funds to hire his own psychiatrist, McWilliams was deprived of basic access to a psychiatrist. Although his life was at stake and his case for mitigation was based on his mental health history, McWilliams received

---

[3] Indeed, we previously stated that "[t]he right to psychiatric assistance does not mean the right to place the report of a 'neutral' psychiatrist before the court; rather it means the right to use the services of a psychiatrist in whatever capacity defense deems appropriate." *Cowley v. Stricklin*, 929 F.2d 640, 644 (11th Cir. 1991) (internal quotation marks omitted). Furthermore, the Majority opinion puts us at odds with our sister circuits on this issue. *See Starr*, 23 F.3d at 1287–88, 1290–91, 1294 (examining the relationship between *Ake* and *United States ex rel. Smith v. Baldi*, 344 U.S. 561, 73 S. Ct. 391 (1953) and reversing where the defendant was provided a "neutral" state examiner); *Smith v. McCormick*, 914 F.2d 1153, 1157–58 (9th Cir. 1990) (holding that *Ake* requires the provision of a non-neutral psychiatrist); *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985) ("The essential benefit of having an expert in the first place is denied the defendant when the services of the doctor must be shared with the prosecution.").

an inchoate psychiatric report at the twelfth hour and was denied the opportunity to utilize the assistance of a psychiatrist to develop his own evidence. As a result, McWilliams was precluded from meaningfully participating in the judicial sentencing hearing and did not receive a fair opportunity to rebut the State's psychiatric experts. Put simply, he was denied due process. *See Simmons v. South Carolina*, 512 U.S. 154, 164–65, 114 S. Ct. 2187, 2194 (1994) (plurality opinion) (citing *Ake*, 470 U.S. at 83–87, 105 S. Ct. 1096–98) (holding that defendant was denied due process where he was "prevented from rebutting information that the sentencing authority considered"). Given these circumstances, the state court's application of *Ake* was unreasonable.[4]

## B. A Substantial and Injurious Effect

We are required to grant habeas relief for an "*Ake* error" if the error had a "substantial and injurious effect" on the trial or sentencing. *See Hicks v. Head*, 333

---

[4] The concurring opinion states that the Supreme Court has not addressed whether *Ake* is satisfied by the appointment of a neutral psychiatrist and, therefore, the state court did not unreasonably apply *Ake*. This focus on the "neutral expert" issue misses the point. Assuming for the sake of argument that a state's failure to provide a defendant access to his own psychiatrist is not contrary to *Ake*, the state court's decision is still an unreasonable application of *Ake*. As noted above, *Ake* plainly holds that when a defendant's mental health is a significant factor at trial or sentencing, due process requires that the defendant receive access to a psychiatrist who can competently "assist in [the] evaluation, preparation, and presentation of [his] defense." *See Ake*, 470 U.S. at 83, 105 S. Ct. at 1096. Regardless of the "neutral expert" issue, Dr. Goff was unable to assist defense counsel with the preparation and presentation of the defense because he did not finish his report until hours before the sentencing hearing and did not have access to pivotal mental health records. Solely considering these deficiencies, it is clear that McWilliams was denied "the assistance of a psychiatrist for the *development* of his defense." *See Simmons*, 512 U.S. at 165, 114 S. Ct. at 2194 (emphasis added) (summarizing the holding in *Ake*). Said another way, the concurring opinion's focus on the "neutral expert" issue misses the broader controlling issue: whether McWilliams received access to meaningful expert assistance.

F.3d 1280, 1286 (11th Cir. 2003) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 1714 (1993)) (internal quotation marks omitted). Alabama's *Ake* error had this effect on McWilliams's death sentence, as it precluded McWilliams from offering evidence that directly contradicted the psychiatric evidence put forward by the State.

At the penalty phase of his trial, McWilliams had no opportunity to respond to testimony provided by the State's expert psychiatrists opining that McWilliams was a malingerer who "faked" mental illness. He was reduced to reading to the judge and jury a technical psychiatric report that indicated he was potentially psychopathic, but the information was virtually useless in the absence of an expert who could explain the report and answer the State's questions. At the judicial sentencing hearing, McWilliams was again denied the assistance he required to respond to the State's expert testimony. Hence, as a result of the trial court's error, a convicted murderer had to testify about his own mental health, was called a liar by State experts, and then was prevented from showing otherwise.

Testimony from McWilliams's state post-conviction hearing shows that, with appropriate assistance, he would have been in position to confront the State's evidence that he was merely feigning mental health issues. At the post-conviction hearing, Dr. George Woods—an expert in psychiatry and neurology—stated that McWilliams's psychiatric testing indicated a "cry-for-help." He then explained the

difference between a "fake-bad" and a "cry-for-help" diagnosis; the former is "someone attempting to make themselves look worse," and the latter, while seemingly "very similar" to the former, actually reflects "significant psychiatric and psychological problems." Dr. Woods further contradicted the State's experts by concluding McWilliams was suffering from bipolar disorder the night of the crime. Dr. Woods's findings relied on, *inter alia*, records from the DOC showing McWilliams was medicated with antipsychotics and antidepressants throughout his entire incarceration. Due to the trial court's failures, McWilliams was wholly unable to present this or similar evidence during sentencing.

Despite this powerful evidence, the concurring opinion finds that McWilliams has not shown a substantial and injurious effect "in part because . . . [he] did not present Dr. Goff as a witness at the state post-conviction hearing[,]" and therefore, "we do not know how additional time with Dr. Goff (and his report) would have benefited the defense." *See* Concurring Op. at 32. But, this argument is belied by Dr. Woods's testimony, which shows that McWilliams would have presented "different," significantly "more viable" mental health evidence during sentencing if he was afforded an expert who actually reviewed his full psychiatric history and had more than a few hours to assist the defense. *See Hicks*, 333 F.3d at 1287.

Furthermore, when considering whether a defendant was prejudiced by a constitutional error that affected his presentation of mitigation evidence, we are required to "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"—and "reweigh[] it against the evidence in aggravation." *See Williams v. Taylor*, 529 U.S. 362, 397–98, 120 S. Ct. 1495, 1515 (2000) (citing *Clemons v. Mississippi*, 494 U.S. 738, 751–52, 110 S. Ct. 1441, 1449–50 (1990)); *Hicks*, 333 F.3d at 1286–87 (weighing the mitigation evidence presented during trial and habeas proceedings in considering whether an *Ake* error had a substantial and injurious effect). In other words, we must consider the evidence *before us*. Nonetheless, my concurring colleague is dissuaded, in part, because "McWilliams did not present Dr. Goff as a witness at the state post-conviction hearing." Concurring Op. at 32. In light of the relevant precedent, I am inclined, however, to weigh the evidence in the record, rather than opine about the value of hypothetical evidence not in the record. *See Williams*, 529 U.S. at 397–98, 120 S. Ct. at 1515.

After weighing the available evidence, we are required to ask ourselves: "does a grave doubt exist as to whether" the *Ake* error "substantially influence[d]" McWilliams's sentence? *See Duest v. Singletary*, 997 F.2d 1336, 1339 (11th Cir. 1993) (per curiam). To me, the answer to this question is clear. McWilliams has shown that but-for the trial court's *Ake* error, the court would have been faced with

45

a starkly different record. McWilliams has put forth evidence contesting the Lunacy Commission, showing he was not malingering, and demonstrating that he suffered from a major mental illness at the time of the crime. Therefore, I cannot find that the *Ake* error did not substantially influence McWilliams's sentence.

### III.

Because the state court's resolution of McWilliams's *Ake* claim was an unreasonable application of *Ake* itself and this error had a substantial and injurious effect, I dissent. To remedy the error, I would reverse the district court's denial of the petition for a writ of habeas corpus so that the matter can be remanded to the state court for a new sentencing hearing.